### TURBEN et al. v. DOUGLASS et al.

No. 10164—Opinion Filed May 13, 1919.

Rehearing Denied Sept. 30, 1919.

(Syllabus by the Court.)

1. **Pleading—Petition—Sufficiency.**

Under the provisions of the Code, it is not necessary that a pleading state facts to bring the cause under any particular form of action at common law, but the petition is sufficient if it states facts in a plain and concise manner which entitle the plaintiff to some legal or equitable relief.

2. **Appeal and Error—Judgment—Sufficiency of Evidence.**

In a civil action, where the parties are not entitled to a trial by jury as a matter of right and where the sufficiency of the evidence is challenged, it is the duty of this court to consider and weigh all the evidence, and if the judgment of the trial court is not clearly against the weight of the evidence it will be sustained.

3. **Joint Adventures—Judgment—Sufficiency of Evidence.**

Evidence in this case examined, and the judgment held not to be clearly against the weight thereof.

4. **Lis Pendens—Purchase of Oil Lease—Pending Action.**

One who purchases an oil and gas lease from a party to an action involving the title thereto, after the institution and during the pendency of such action, acquires no greater rights in the lease than his assignor had at the time of the assignment.

Error from District Court, Cotton County; Cham Jones, Judge.

Action by C. E. Douglass against I. E. Turben, John C. Keys, and H. L. Thompson. Judgment for plaintiff against defendants Turben and Keys, and they bring error. Affirmed.

John M. Young and Charles Mitschrich, for plaintiffs in error.

S. I. McElhoes and Bridges & Vertrees, for defendants in error.

RAINEY, J. On March 24, 1916, Chas. E. Douglass, as plaintiff, filed his petition in the district court of Cotton county against I.

E. Turben, John C. Keys, and H. L. Thompson, defendants, the principal allegations therein being as follows:

"That in 1915 plaintiff and defendant I. E. Turben entered into an agreement to promote an oil and gas prospect in Cotton county, Okla., each to share equally in the enterprise, that in pursuance of said agreement leases were to be obtained in said county which leases were to be the joint property of this plaintiff and the defendant I. E. Turben; that all the leases so taken were taken in the name of I. E. Turben, and still remain in the name of the defendant I. E. Turben.

"Plaintiff has requested and demanded of the said defendant Turben that he convey or assign an undivided one-half interest in and to all of said leases to this plaintiff, but the defendant Turben refuses to do so.

"The leases referred to above are as follows, and all are located in Cotton county, Okla., and are made to the defendant I. E. Turben, to wit: [Then follows a description of each lease.]

"Plaintiff is entitled, under the terms of the agreement hereinbefore referred to, to an undivided one-half interest in and to each and all of the above-described oil and gas leases and the defendant I. E. Turben holds the same in trust for the use and benefit of this plaintiff.

"The defendant I. E. Turben has executed an assignment of a portion of the above-described leases to the defendant H. L. Thompson, which assignment is recorded in Book 12, at page 438 of the records in the office of the county clerk of Cotton county, Okla., and is for the leases on the following lands: [Description of certain leases.]

"The said defendant H. L. Thompson, at and before the time he took said assignment, had actual knowledge that this plaintiff owned and was entitled to an undivided one-half interest in and to all of the leases to which he took the above assignment.

"Wherefore plaintiff prays that the court decree and order that the plaintiff herein is entitled to and does own an undivided one-half interest in and to all of the leases herein described, and that the defendants be required to execute to this plaintiff an assignment of such interest, and that in lieu of said assignment the court make an order assigning such interest to this plaintiff, and that plaintiff recover his costs herein expended, and for such other and further relief as to the court shall seem equitable."

Issue was joined by the respective defendants, and the cause tried to the court, resulting in a judgment decreeing the plaintiff to be the owner of an undivided one-half interest in the leases remaining in the name of the defendant Turben on the date of the institution of the action, and ordering said defendant to execute and deliver to the plaintiff a good and sufficient assignment thereof. The judgment also awarded the plaintiff an undivided one-half interest in a lease conveyed by the defendant Turben to the defendant Keys after the institution of the suit, and provided that in the event defendants failed to make the assignments to the plaintiff the judgment of the court should have that effect. No judgment was entered against defendant Thompson. From the judgment aforesaid Turben and Keys have appealed to this court, assigning numerous errors.

Hereinafter the parties, for convenience, will be referred to as plaintiff and defendants, respectively.

It is first asserted that the petition did not state facts sufficient to constitute a cause of action. If we accurately comprehend the objections to the sufficiency of the petition, they are that it is impossible to deduce therefrom whether plaintiff's claim is on an express trust, a resulting trust, an implied trust, or a constructive trust, and it is earnestly insisted that it is impossible to conclude from the allegations therein whether plaintiff ever contributed any money, time, or anything of value whatever to the project. It is also insisted that the petition does not disclose whether by the terms of the alleged agreement the leases in contemplation were to be taken in the name of the defendant Turben, or whether Turben, in subsequently taking them in his own name, did so either with or without plaintiff's knowledge, and whether the contract had been fully performed, or what, if anything, was to be done by either or both of said parties thereunder. Another criticism of this pleading is that it does not appear therefrom what either party had contributed in money, property, or services to the project, what consideration was given for the leases, what was necessary for the lessees to do in order to render the same valid, and in what manner the alleged agreement had been violated by either of the parties thereto.

In this jurisdiction, where the forms of action theretofore existing were abolished by the adoption of the Code and there was thereby substituted only one form of action known as a civil action, it is not necessary that the petition should contain averments of all the facts necessary to be proved to entitle the plaintiff to recover under any particular form of action that existed at common law. R. J. Hawkins v. T. J. Overstreet, 7 Okla. 277, 54 Pac. 472; Joseph Gabriel v. Kildare Elevator Co., 18 Okla. 318, 90 Pac. 10, 10 L. R. A. (N. S.) 638, 11 Ann. Cas. 517; Kee v. Satterfield, 46 Okla. 660, 149 Pac. 243.

Under section 4737, Rev. Laws of 1910, a petition is sufficient where it contains a statement of facts constituting a cause of action in ordinary and concise language and the demand for relief to which the party supposes himself entitled.

Although plaintiff's petition is somewhat indefinite and uncertain in many of the respects complained of, in that it fails to allege with precision the exact terms of the alleged contract, it does allege the making of an enforceable contract by the plaintiff and defendant Turben, and it is fairly inferable from the averments in the petition that under the terms of said contract the leases taken pursuant thereto, whether by the plaintiff or the defendant, were to become the joint property of the contracting parties, that said leases were taken in the name of the defendant Turben, and that he had breached the agreement by refusing to recognize the plaintiff's claim to an undivided one-half interest in the leases so taken. It sets forth the particular leases to which the plaintiff claims title, and very clearly demands the relief to which the plaintiff thinks he is entitled. The proper way to have taken advantage of the defects in the petition was by motion to make the petition more definite and certain; and, although a motion to make the petition more definite and certain, by requiring the plaintiff to allege whether his alleged contract was oral or in writing, was filed, such motion did not direct the attention of the court to the alleged defects in the petition now so vigorously urged, and no error is assigned as to the court's action on this motion. We, therefore, hold that plaintiff's petition was good as against both the motion for judgment on the pleadings and the general demurrer, for it is well settled that where a pleading states any facts upon which the pleader is entitled to any relief, under the law, a general demurrer should not be sustained thereto. Bishop-Babcock-Becker Co. v. Estes Drug Co., 63 Oklahoma, 163 Pac. 276.

Under the provisions of section 4993 of our Code (Rev. Laws 1910) the issues of fact in this case were properly triable to the court, and, invoking the rule announced by this court in Schock v. Fish, 45 Okla. 12, 144 Pac. 584, Wimberly v. Winstock et al., 46 Okla. 645, 149 Pac. 238, and Mendenhall et al. v. Walters et al., 53 Okla. 598, 157 Pac. 732, counsel assert that the judgment of the trial court is clearly against the weight of the evidence. Therefore it is the duty of this court to consider the whole record, to weigh the evidence; and, if after weighing the same the judgment is found to be clearly against the weight thereof, it is our duty to render, or cause to be rendered, such judgment as should have been rendered by the trial court, otherwise to sustain the judgment.

We do not deem it necessary in this opinion to make a detailed statement of all the evidence adduced at the trial, and we will not attempt to do so, but we will briefly allude to some of the undisputed facts and to the plaintiff's and defendants' testimony introduced in support of their respective theories of the case.

At the commencement of the transactions, which we shall presently relate, the plaintiff, Chas. E. Douglass, was an experienced oil man, having been engaged in that vocation since 1904, principally in drilling wildcat wells. In August, 1914, he became interested in southwestern Oklahoma, and from his investigation and studies of the United States government geological survey had ascertained that Cotton county was considered favorable for prospective oil and gas development, and was of the opinion that territory near Lawton, in Comanche county, and Walters, in Cotton county, might produce oil and gas, and for the purpose of better informing himself as to the prospects, employed a geologist, who, after investigating for 12 or 15 days in the vicinity of Lawton, recommended as favorable for drilling several locations, including the one where the leases in controversy were afterwards acquired. While in Lawton, Douglass became acquainted with a Mr. Anderson and a Mr. Bellamy, who directed his attention to the territory where the leases in controversy were later taken. Douglass also learned from them that operations had been commenced in that vicinity, and that a rig had been built on Anderson's land, but, owing to financial difficulties, the proposition could not be further financed, and the leases had lapsed. Douglass, who at that time was engaged in drilling elsewhere, promised to take up the proposition as soon as he could get to it. He continued, however, to spend some time in this vicinity in prospecting in Comanche and Cotton countes, and was still so engaged when he received a letter at his home address in Okmulgee, Okla., from the defendant Turben, who was then residing in Cleveland, Ohio, in which Turben informed Douglass that he (Turben) was interested with a Mr. Manchester, of Maysville, Ky., in drilling a well, and that Mr. Manchester, being advised of Turben's desire to engage in the oil business in Oklahoma, had advised him to write Douglass in order to get in touch with him when he arrived in Oklahoma. In this letter Turben advised Douglass that he would be ready to come to Oklahoma within a short time, that he had had about 18

years' experience in the oil business, had a large string of tools, and would like to get started in Oklahoma with some one who had acreage and would carry an interest with him, as he did not have much money, but had a small income, and that he would advise Douglass before starting to Oklahoma. In his reply to this letter Douglass suggested to Turben that he come to Oklahoma and view the future prospects, advising him that he had a well to drill on a 3,000-acre tract of leases which seemed to be nicely located for an oil and gas prospect, and that if Turben would come to Okmulgee they might make some arrangements to drill some wells and for Turben to take an interest in the leases. The parties then had some further correspondence relative to the advisability of shipping the tools before coming to Oklahoma; Douglass advising Turben not to ship the tools until he had looked the country over, as he might conclude to ship to some other point than Okmulgee. In one of the letters, among other things, Douglass said:

"I will be glad to give you any information I can after you get here. Also if my wildcat propositions look good to you I will make you some propositions to join me."

Turben arrived in Okmulgee some time in November, 1915, and, according to Douglass' testimony, he advised Turben that they could get a certain block of acreage described on a plat furnished him by Anderson and Bellamy, which Douglass exhibited during the conversation, provided that they would drill a well on it, the acreage so exhibited being that involved in this case. Douglass informed Turben of his intention to visit Lawton within a few days, and invited Turben to go with him and look the proposition over, informing Turben that if the acreage looked good to him and he wanted to join him in the proposition they would get busy, secure the leases shown on the plat, and that they would jointly promote the proposition and get a well drilled on it for a part of the acreage, reserving as much of the acreage as possible. Turben acceded to this and a few days later they went to Lawton and, according to Douglass' testimony, discussed the proposition practically all the time on the way over. When they arrived at Lawton, Douglass called Mr. Anderson over the telephone and notified him that he was there with a man who would go with him to look over the situation the next morning with a view of taking the leases, and at Anderson's suggestion they met at the office of Mr. Cassin, a real estate man in Lawton, where Douglass introduced the parties and informed Anderson that Turben was the man he had brought down to

look over the leases with a view of renewing the same and drilling a well. According to plaintiff's testimony, at his suggestion, Anderson got a car and took Turben out to see what could be done with reference to obtaining the leases. Douglass did not accompany them on this trip, but before they started he said to Turben:

"Go down there and see what you can do, see if you can get these leases; if I can be of any assistance to you call me over the telephone or come after me, and I will see you through with the deal."

Douglass then returned to Okmulgee, and within a few days received the following letter from Turben:

"As I did not see you Saturday took it for granted you went home on the morning train. I can get the casing furnished for the well near Hulen and think it possible that I can get a man here to drill it. I am going down Wednesday or Thursday. If there is anything you want me to see to let me know and I will do my best."

This letter was sent from Lawton, November 22, 1915, and about a week thereafter Turben wrote Douglass another letter, postmarked "Tulsa, Oklahoma," which is as follows:

"I am going to Lawton at 11:40 and think I shall be over there for a couple of weeks.

"I have arranged for the casing to drill the well and am going to take some more acreage and will try to make a deal with Hall for oil and fuel.

"Drop me a line and let me know if you are coming over."

On December 10th following, Turben again wrote Douglass, the material parts of the letter being as follows:

"I have gotten this block in pretty fair shape, but it has been a hard job, although it has not cost much actual money.

"I am inclosing a plat as I have it leased; that marked in black is the first block taken; that in red is the second block taken; the ones in blue I have in my possession; and the ones marked with a cross I am getting as well as about 6 other quarter sections.

"We have to be started by the 17th of January on the first block; the other I have till the 8th of June, 1916, and can take them down by paying a quarterly rental of $40.00 to the quarter section.

"I am ready for your men and hope to see you over here with them very soon. I think we can make arrangements to get oil for fuel that will not cost over one dollar or one dollar and a quarter."

According to the plaintiff's testimony, when the contract was made to enter upon the venture, it was understood and agreed that all of the leases that did not have to be assigned or sold for the purpose of drilling the test well were to become the joint property of the contracting parties, and after the leases were acquired he made efforts to have a test well drilled and immediately took the matter up with some Kansas City people, who had promised to go down and look over the proposition, and with reference thereto on January 3d, addressed the following letter to Turben:

"I am expecting to get out to Lawton with my Kansas City people Thursday or Friday of this week. I will leave here Tuesday for Limestone Gap where I am drilling my well and be there for a couple of days and come from there to Lawton. I hope you have everything in shape, and that we can get the well started at once"

—and on January 7th addressed the following letter to Turben:

"I mailed you letter a few days ago, telling you I would be at Lawton the last of this week, but my K. C. people have disappointed me in getting down here and I don't know just what to say to you. I know you have got to get started on that block of leases by the 17th. I have not got my well finished yet and can't tell just when I will, but within a week or ten days. I just can't leave here at this time. You do whatever you think best about that proposition out there. I will come out and join you just as soon as I can get finished here. Write me here at Limestone Gap. Tell Mr. Cassin I can't get out there for a few days."

On January 6, 1916, Turben telegraphed from Strawn, Tex., to Douglass at Okmulgee, Okla., as follows:

"Time on leases are getting short. Have financed deal and will be drilling by the time set forth in lease. Sorry I did not hear from you sooner."

Besides the above letters, which were introduced in evidence, plaintiff said he remembered writing a letter addressed to the defendant in Texas, in which he told the defendant to go ahead and do the best he could with the proposition, to obtain the leases and get things started and to draw on him for his part of the deal. During the times covered by the correspondence Douglass was engaged in drilling a wildcat well near Limestone Gap, Okla., and after Turben advised him that he had financed the deal and would be drilling within the time specified in the leases he did not pay any particular atten-

tion to the proposition until March, 1916, when he returned to Lawton and first discovered that the leases had not been taken in their names jointly, but were in Turben's name only. He testified that on discovering this fact he inquired of Turben why the leases had been taken in this manner, and Turben replied it was in order to make assignments promptly in the event he made arrangements for a test well for part of the leases. About two days after this conversation Turben refused to assign any of the leases to Douglass, stating that Douglass was not entitled to any interest in the leases, since he had not put anything into the deal. Douglass also testified that, in addition to about 15 months' time spent in the vicinity of Lawton in investigating the prospects of the territory and his own expenses, he paid the geologist $25 a day for his services and his expenses, which included $20 a day for a car and his hotel bill at the rate of $2 per day. Douglass further testified that Turben had never asked him for any money or expenses, and that he was at all times ready, willing, and able to pay whatever his part was and to carry out his part of the agreement.

Turben corroborated the plaintiff with reference to the correspondence, their meeting at Okmulgee, and their trip to Lawton for the purpose of looking over the territory with a view of securing leases, but denied that the particular leases in controversy were specially mentioned or in contemplation by the parties before they reached Lawton, and said the acreage which they had discussed was northeast of Lawton, in a different location. Turben testified that the morning after they arrived in Lawton they went to Mr. Cassin's office, and from there he and Douglass, Cassin, and a geologist named Fisher, went out east of Lawton and spent two days in looking over the acreage in that locality, but that Douglass declined to drill a well at that place, assigning as his reason that the geologist did not make a favorable report; that the first time defendant heard anything about the acreage involved herein was when Cassin spoke to him about it three days after they arrived in Lawton; that at that time Mr. Cassin called Anderson over the telephone and advised him that he had a man (Turben) who might be interested in leases in the locality where the leases in controversy were subsequently acquired; that witness went out with Anderson, and with his assistance had a meeting of the farmers of the community, which resulted in the taking of 14 leases in what defendant denominated the first block;

that later they took other leases in that vicinity, and that, in addition to his time, defendant paid a man $5 a day to drive him over the country while he was engaged in acquiring the leases. The first leases acquired by Turben in his own name were put up in escrow with an agreement that he was to commence drilling a well on or before January 17th. According to Turben's testimony, he saw Douglass at Lawton the afternoon of the first day after he went to the Anderson community, and informed him that he could get the leases, and inquired of Douglass whether he could get the money to drill with after the leases were secured, and that Douglass replied that he would, and that he then agreed to give Douglass an interest in the leases if he would procure some one to drill them. Continuing, the defendant testified that Douglass did not procure any one to drill the test well, and that after he had vainly endeavored to get other parties to drill he finally got a man named Rogers to assist him, who gave him two checks, one for $225 and one for $100, to be used for this purpose. Turben had some previous acquaintance with a Mr. Thompson, who lived and was at that time in Pennsylvania, and, after securing the checks from Rogers, he began negotiations by telegraph with Thompson, which resulted in Thompson agreeing to let Turben have some tools, which were then at Strawn, Tex., in consideration of Turben assigning to him some of the leases. Turben went to Strawn, Tex., and shipped the tools to Walters, Okla., where they arrived about January 11th, but when he started to unload them he received notice from the bank that Rogers' checks had gone to protest, and as he had deposited the checks to his own account and checked thereon for $177 for freight, his check also went to protest, which necessitated his making other arrangements for the payment of the freight. Turben says that it was when he had perfected arrangements for the tools that he sent Douglass the telegram from Texas and advised Douglass that he had financed the deal and could commence drilling on time. Turben commenced the well on the 15th of January and testified that about the 17th of January, being unable to finance the proposition any further, he procured Cassin to call Douglass over the telephone informing him of the situation and asking his advice about going ahead with the deal, and requesting that he get money to continue drilling; that he did not get any help from Douglass, but obtained about $2,000 in cash from Thompson, in addition to the tools, which enabled him to drill about 260 feet by March. Being unable to finance the proposition further, he stopped drilling operations some time in March, and

subsequent thereto, through a Mr. Shaw, who represented John C. Keys, one of the defendants herein, Turben negotiated a deal with Keys by which, in consideration of an assignment of a large part of the acreage to him, Keys agreed to and did complete the well. It produced gas in paying quantities.

Cassin testified to having had the conversation with Douglass over the telephone, and stated that Douglass declined to put up any money, and, although Douglass admitted having had some conversation with reference to the leases, he denied that he refused to put up any money.

It is apparent that there is a sharp conflict in the testimony of Douglass and Turben as to a material part of their agreement; the gist of Turben's testimony being to the effect that they were to be joint owners of the leases in controversy only on the condition that the plaintiff should drill or procure the drilling of a test well, and the gist of Douglass' testimony being that the agreement was to secure the wildcat acreage in the locality where it was acquired, and that, after selling or assigning sufficient acreage to procure the drilling of the leases, the contracting parties were to be jointly interested in the remainder. The facts which are not disputed, including the letters and telegrams in the record, in our opinion, clearly support plaintiff's theory of the case, and the judgment of the trial court is not only not clearly against the weight of the evidence, but is in accord therewith. We have not overlooked the fact that the defendant endeavored to explain the letters, and particularly the language therein that indicates they were both interested in the proposition, but since the trial court, after hearing this explanation and all the other evidence relating to and surrounding the transaction, found for the plaintiff, we would not be justified in holding that such finding is clearly against the weight of the evidence.

We are impressed with the earnestness of counsel's argument that the plaintiff, Douglass, if permitted to prevail in this case, will reap a bountiful harvest where he has not sown, but we are unable to view the case in this light. It would be impossible to demonstrate with mathematical precision in just what proportion each party contributed to the success of the venture they voluntarily entered into, for, while neither contributed much money, Douglass contributed his experience as an oil man, what he had paid the geologist in investigating the possibilities of the territory, and his knowledge of the conditions in that locality, and Turben, after he was made acquainted with the conditions

in the prospective field through the efforts of Douglass, pursued the project with commendable zeal, overcoming many difficulties which in all probability would have deterred a less resolute man. However, at the same time Douglass was also working on the proposition and was endeavoring to secure the Kansas City people to drill the test well. Without Douglass' experience and knowledge Turben's attention would never have been directed to the project which was carried on to such a successful conclusion. It was through Douglass' efforts that Turben came to Oklahoma and became interested in the project, without which he might still be laboring in less profitable fields. As is disclosed by Douglass' testimony in this case, the pathway of the wildcatter is not always strewn with flowers nor his efforts crowned with success, and we think it is nothing but right, as the trial court found, that the plaintiff and defendant should share equally according to their contract in the successful venture.

Complaint is also made of that part of the court's judgment which decreed that the plaintiff was the owner of an undivided one-half interest in a 40-acre lease held by the defendant Keys. The record reveals that this lease was first assigned prior to the institution of the suit by the defendant Turben to one Anderson as collateral security for a loan made to the defendant, the proceeds of which were used to pay freight on machinery, and about nine months after the institution of the suit defendant Turben sold the lease to Keys for $125. Such sale and assignment having been made pendente lite, the defendant Keys acquired no greater rights therein than Turben had at the time of the assignment, and there was no error in the court's judgment in this respect. Baker v. Leavitt et al., 54 Okla. 70, 153 Pac. 1099; Guaranty State Bank of Okmulgee v. Pratt et al. (No. 9167) 72 Oklahoma, 180 Pac. 376, handed down April 15, 1919.

We do not hold that the plaintiff is not liable for his proportionate share of the expenses incurred by the defendant in promoting the venture, but the defendant in his pleadings did not ask that the plaintiff reimburse him for any part of this expense, although the plaintiff had offered to do equity and to pay whatever sum that was justly chargeable against him.

The judgment is affirmed.

SHARP, HARRISON, McNEILL, and PITCHFORD, JJ., concur.