### TANKERSLEY INV. CO. et al. v. TANKERSLEY INV. CO. ex rel. TANKERSLEY et al.

No. 32301. May 17, 1949.

Rehearing Denied June 28, 1949.

Second Rehearing Denied Sept. 28, 1949.

*210 P. 2d 167.*

Draper Grigsby and Looney, Watts, Fenton & Billups, all of Oklahoma City, for plaintiffs in error.

Cantrell, Carey & McCloud and Edward M. Box, all of Oklahoma City, for defendants in error.

ARNOLD, V. C. J.. The principal question presented by this appeal is one of fact and that is the controlling question, as we view it.

That question is whether Earl Tankersley sold and Dan Tankersley bought Earl's stock in the Tankersley Investment Company. For brevity the two will be referred to by their first names. Earl contends he did not sell or agree to sell. Dan contends they did agree and that he bought and fully paid for Earl's stock, in complete compliance with the agreement.

It is our duty to affirm on the fact question unless we find the trial court conclusion to be contrary to the weight of the evidence. Payne v. Wade, 190 Okla. 222, 122 P. 2d 144, and Uhrina v. Mastako, 100 Okla. 294, 229 P. 196. And it is equally our duty to reverse if we find that conclusion to be clearly against the weight of the evidence. Crabtree v. Standard Savings & Loan Association, 187 Okla. 189, 102 P. 2d 127, and Turban v. Douglass, 76 Okla. 78, 183 P. 881.

In such a case it is our duty to examine the record, weigh the evidence, and from an overall consideration of the record, in the light of the briefs and arguments, to determine whether the evidence supports the trial court conclusion.

The contest is between two brothers who for more than ten years operated together in prosperity and complete harmony, but who in depression times faced business bankruptcy and came to outspoken enmity towards each other. Dan, the older, founded the business life involved before the first World War, continued it after he returned from that service, and about 1926 took in the younger brother Earl as an equal partner. The productive business ac-

tivity was that of construction contracting.

From an humble beginning there was some prosperity, but not great wealth. Two corporations were formed, one the Tankersley Investment Company, to hold title to an apartment building in Tulsa, and another the Tankersley Construction Company to cover the productive business of the brothers. The dates of incorporation are unimportant, likewise the exact stock issuance details. There were enough stockholders for legal requirements. But for all practical purposes, and all purposes of this consideration, Dan and Earl each owned one-half of each corporation, and they worked together in harmony.

All went well with co-operation and congeniality until in the 1930's when adversities came. In about 1934 Earl took federal employment in executive or administrative work for H.O.L.C. full time, while Dan continued work, giving his full time to and with the two corporations. Both brothers continued to draw money for personal use from the corporate funds and from the corporate bank account.

The financial condition of the two corporations went from bad to worse, and to very much worse, until both corporations came to be insolvent, and heavily involved, and as it then appeared, perhaps hopelessly insolvent.

That was the condition of the corporations in 1939. The apartment building was mortgaged for substantially more than it was worth and the Investment Corporation only awaited to be foreclosed out of existence. The Construction Corporation was in debt many thousands of dollars more than its assets with little construction work to be had.

Meantime the brothers had been separated in work as above stated, their relationship had become strained by Earl's continuing checking against the corporate bank account. There were harsh words, and bitterness, and active hostility, and in late 1939 a complete break, and open enmity between the two brothers.

They could no longer operate together or tolerate each other, and it became apparent that the business or corporate affairs might go overboard entirely or that one of the brothers must buy out the other, and it was so stated between them, and so understood and agreed between them. Earl either was not interested, or not able to consider buying. Dan, with no other activity in mind, or available to him, did desire to carry on with the corporations.

Each of the foregoing facts is either conceded, or definitely shown without dispute, and we come down to consider what did or did not happen in the closing days of 1939, and the early part of the following year 1940.

We should now notice briefly the contentions of the parties. Both parties concede that there were negotiations in reference to sale by Earl and purchase by Dan, but Earl contends they never went beyond the state or stage of negotiation. Dan's contentions are that he bought and paid for and took over the properties from Earl by agreement fully consummated. In further detail Dan contends that he requested Earl to list what he wanted as full consideration to get out of both corporations, and that Earl listed the following requirements:

(1) Release of a certain oil payment owned by him, but at that time pledged to a bank for his indebtedness to the bank of a little over $2000.00;

(2) A stated list of building machinery and equipment to start in the construction business for himself; and

(3) Payment of his personal income taxes, state and federal for 1939; and

(4) Dan to assume and release Earl from all corporate debts, including Earl's debt to the corporations of about $26,000.

Dan contends that he agreed to all that and made full and complete compliance, thereby paying Earl the full consideration agreed upon for his half of both corporations.

The extreme bitterness between the brothers was spiteful and severe. The testimony offered by each brother fully and vigorously supports his own theory and would completely vanquish and banish the advisory theory. Their own statements are so at variance that we have tried to give such statements full credence only when supported by outside physical facts or demonstrated truths.

In such a case there is splendid application of the rule giving special force to manifest physical situations, physical facts, common knowledge, and conceded facts or facts established by evidence beyond room for fair controversy. In Samulski v. Menasha Paper Co., 147 Wis. 285, 133 N.W. 142, it was held:

"The testimony of a witness or finding of a jury, contrary to manifest physical situations, common knowledge, or conceded facts, is efficiently impeached thereby.

"A physical fact, existent as matter of common knowledge or established by evidence beyond room for fair controversy, cannot be overcome by human testimony, opinion or theorizing."

And in Schrager v. Foster, 108 N. Y. S. 240, it was held:

"A verdict based on a finding directly contrary to physical facts established by uncontradicted evidence cannot stand."

In further reference to the above-stated contentions of the parties, the physical facts demonstrate that Dan did (1) borrow money personally and pay off Earl's debt at the bank and obtain release of Earl's oil payment at the cost of a little over $2,000, and had the oil payment returned to Earl, and (2) Dan delivered a stated list of building machinery and equipment to Earl which was picked up by a man representing Earl from a man representing Dan at Dan's yard and it was receipted for and delivered to Earl, and (3) Dan did pay Earl's income tax, state and federal, for 1939, and (4) Dan did assume, and ultimately paid, all of the debts, releasing Earl from any claim thereon, including releasing Earl from his debt to the corporation's account of about $26,000. In addition thereto Dan took over and operated all of the properties to the exclusion of Earl, and with Earl's full knowledge and consent excluded Earl from the bank account by going to the bank and withdrawing all checking authority from Earl.

In view of all the circumstances, we must consider both corporations together. That is, Dan either bought both corporations as he contends, or he did not buy either one, as Earl contends.

As a further physical fact, in 1940 Earl organized and incorporated his own construction business in the name of Builders Construction Company, using the equipment obtained from Dan mentioned in item (2) above, and during 1940 operated in direct competition with Dan as is demonstrated by their competitive bidding on several jobs, some of which Dan obtained and some of which Earl obtained.

In view of these circumstances we cannot believe that nothing more than negotiations occurred between Dan and Earl. It is most strongly indicated that a complete trade of purchase and sale was made and concluded. This view is strengthened by the fact that for many months Earl made no claim to continued ownership or interest in any of the properties, and did not make such claim until after Dan had worked the properties out of debt or nearly so, and in the corporate name had obtained or entered into government construction contracts of great value, and until changing conditions had greatly increased the value of the apartment house in Tulsa.

There are some physical facts on which Earl relies. The principal one is that the stock certificates were not delivered to Dan, and that after the purported sale and purchase there were some corporate reports which still referred to Earl as the holder of that corporate stock. We think that is fully covered by Dan's explanatory statements

and by the physical facts, or undisputed facts, that through a number of years the brothers considered and handled the properties more as family properties than as corporations, and that they looked to the properties themselves rather than to the corporate structures as such.

Another fact relied upon by Earl is in reference to a former suit in which the construction company was involved, and in which there was a preliminary finding for Earl, after which Dan paid Earl an agreed sum by way of compromise and settlement. We have given that consideration, but in view of the exact circumstances, we find nothing therein to bar or estop Dan from prosecuting his contentions here, and nothing there to cast any additional burden or doubt on Dan's theory or contention. It is still our duty to test the judgment here by the evidence here, and that we have done in reaching our conclusion.

We cannot escape the conclusion that the contentions of Dan are sustained by the great weight of the evidence when we consider the following: The definite insolvency by many thousands of dollars of each corporation in 1939; and with actual and expressed knowledge of both brothers; the vigorous hostility of the brothers which made it impossible for them to operate together as they had in the past; the imminent necessity that one of the brothers buy the other out and take over exclusively; the stated knowledge thereof and agreed acquiescence therein by both brothers; the inability or disinterest of Earl to be the one to take over which was communicated to Dan; the willingness of Dan to take over which was fully communicated to Earl; the negotiations as to terms; the several items of valuable consideration passing from Dan to Earl amounting in the aggregate to about $30,000, all received and retained by Earl; that these items either went to Earl as the consideration consummating the purchase and sale agreement as contended by Dan, or they went voluntarily to Earl without any considera-

tion therefor passing to Dan, and at a time when their ill feeling was most serious; that Dan actually took over the properties and exclusive management thereof and excluded Earl therefrom, and specifically excluded Earl from the bank account with Earl's knowledge and acquiescence; that for a substantial period of at least many months Earl made no claim to continuing rights or continuing ownership of an interest in the properties, or to continuing rights in the bank account, but, on the contrary, made voluntary statements against any such interest or claim; that during such period Earl incorporated and thereafter separately operated in direct opposition to and in direct competition with Dan, though Earl is now in the position of claiming that during such period he was always a full half owner with Dan in Dan's business while owning exclusively his own competing business.

We have considered the testimony of all other witnesses, some of whom had dealings with the two brothers before and after the time of the disputed purchase and sale. We have undertaken to evaluate that evidence and all the evidence in the light of the known facts or undisputed facts.

Nor have we overlooked the findings of the trial court. We think it is apparent the trial court gave too much weight to the one fact of nondelivery of the stock certificate. In the ordinary purchase and sale of corporate stocks, where consummated purchase is asserted by one, but wholly denied by the one asserted to be the vendor, the retention by him of the stock certificate would be strong evidence. However, it is not so strong under the circumstances here shown and in view of the explanation given. Furthermore, the trial court in his determination went too far in separating the two corporations in considering whether a sale of one corporation was made in 1939. It is true this action only involves one of the two corporations. But they were so bound together and so handled in the ownership of these two brothers that we are

convinced that our approach to the question is dictated as the proper course on account of the overall situation peculiar to the facts and relationships here shown.

From an examination of the entire record, we are convinced that the great weight of the evidence is with the contention of Dan and requires the conclusion that Earl sold his corporate interests entirely and received and retained the required and agreed consideration therefor, and that it is our duty to reverse the judgment appealed from and to remand the cause, with directions to render judgment in favor of the plaintiff in error Dan, and accordingly the judgment is reversed with such remand directions.

DAVISON, C.J., and WELCH, CORN, and O'NEAL, JJ., concur. GIBSON, LUTTRELL, HALLEY, and JOHNSON, JJ., dissent.

GIBSON, J. (dissenting). I think the appeal should be dismissed.

On October 8, 1943, R. H. Siegfried Company brought an action on a promissory note against Tankersley Investment Company in the district court of Tulsa county. Earl Tankersley, by leave of court, filed a petition of intervention in said action setting up that he was the owner of one-half of the stock of said corporation; that his brother, Dan Tankersley, was the owner of the other one-half of the capital stock and that Dan Tankersley was neglecting or refusing to defend the action and was attempting to exclude Earl Tankersley from all participation in the corporation, and asked that he be permitted to defend the action for and on behalf of Tankersley Investment Company. Thereafter Dan Tankersley filed a petition in intervention denying that Earl Tankersley was the owner of any stock in the corporation, but asserting that the stock owned by Earl had been sold and delivered to Dan in December, 1939, and praying that the intervening petition of Earl Tankersley and all pleadings filed by him be dismissed. When the case came on for trial, the trial court held that Earl would not be permitted to defend the action for Tankersley Investment Company or to participate in the action in any way unless and until he had established his ownership of the capital stock of the corporation claimed by him. The matter was tried to the court. At the conclusion of the evidence, the court held that Earl had established his ownership of the stock and that he would be permitted to participate in the action, both personally and on behalf of the corporation. From this judgment, Dan Tankersley appeals.

The issue tried did not involve the merits of the action. It was merely to determine which of two persons would be permitted to defend the action for a corporate defendant. The judgment rendered decided none of the merits of the action. Dan and Earl Tankersley, being intervencrs in a suit on a promissory note, took the issues in that action as they found them and could not either change the issues or insert new issues in the action. Nor was the judgment rendered a final order from which an appeal would lie under 12 O. S. 1941 §952.

In Starritt v. Schulte, 193 Okla. 437, 145 P. 2d 177, we held:

". . . A determination by the trial court that a party is entitled to the benefits of the act, as an occupying claimant, is not, standing alone, a final order and no right of appeal therefrom is authorized."

In the opinion it is stated:

". . . All errors saved and shown by the record may be reviewed on appeal from the final order contemplated. The determination of the right to the benefits of the act is a necessary precedent to the right of recovery of a money judgment for excess value under the act, and there is no final order in such a proceeding where there has been a determination that the one occupying the premises is entitled to the benefits of the act until there is a determination of the value of the permanent improvements made in good faith and in addition to a determina-

tion of the amount of rents due and damages and waste suffered and judgment entered as provided. This being true, there has never been a final or appealable order entered in this case. Both parties concede the general rule applicable in such an instance, and this cause must therefore be, and the same is, dismissed."

In Oklahoma City Land & Development Co. v. Patterson, 73 Okla. 234, 175 P. 934, we construed "final order" as follows:

"A 'final order' is one ending the particular action in which it is entered, leaving nothing further for the court pronouncing it to do in order to determine the rights of the parties."

In Sokolosky v. Black, Sivalls & Bryson, Inc., 197 Okla. 68, 168 P. 2d 618, we held:

"1. An appeal does not lie to this court from an intermediate or interlocutory order made during the pendency of an action, which intermediate or interlocutory order leaves the parties in court to have the issues tried on the merits, unless the appeal sought to be taken comes within some one of the special orders from which an appeal is authorized by statute prior to final judgment in the main action.

"2. An order made during the proceedings refusing to dismiss the action at the instance of the defendant and leaving the same for trial is not such an order as can be considered prior to a final disposition of the cause."

Numerous other cases might be cited, all of which follow the rule laid down by the Territorial Court in Easton v. Broadwell, 8 Okla. 442, 58 P. 506, as follows:

". . .The order complained of is not a final order, nor one concerning a continuance; nor does it discharge or otherwise affect any provisional remedy or injunction; nor are the merits of the action, or any part thereof, in any way involved. The order made by the court in this case was a mere interlocutory order, and left the rights of the parties upon the merits of the action entirely unadjudicated. It should

not have been brought here until the case was finally determined upon the merits. McCallum v. Lambie, 145 Mass. 236, 13 N. E. 899.

"There is no appeal from an order like that which was made in the court below, unless specifically provided by the statute. (Brown v. Rice, 30 Neb. 236, 46 N. W. 489; Duff v. Duff, 71 Cal. 513, 12 P. 570; Fleitas v. Richardson, 147 U. S. 538, 13 S. Ct. 429.)

"The appeal will therefore be dismissed."

"In Wells v. Shriver, 81 Okla. 108, 197 P. 460, we held:

"1. Under the Oklahoma Code of Civil Procedure there can be but one judgment in an action.

"2. A judgment is the final determination of the rights of the parties in an action. To constitute a judgment under the Code, it must judicially determine all of the issues raised by the pleadings except such as are waived or abandoned on the trial of the case.

"3. A judgment must not only determine the rights of the parties in an action, but must conclude all further inquiry into the issues joined by the pleadings and leave nothing further to be done except to carry it into execution.

. . .

"5. To constitute a final order in an action, it must be an order affecting a substantial right in the action, and the effect of such order is to determine the action and prevent a judgment.

"6. The party aggrieved by any order made by the court or judge thereof in an action before judgment and which is not a final order, may save his exceptions and have such order reviewed by this court when brought up by proper proceedings in error to review the judgment rendered by the trial court, notwithstanding more than six months have elapsed since the making of such order, provided the petition in error is filed in this court within the statutory period of time to give this court jurisdiction to review the judgment."

It is obvious that the judgment is not a final order and does not affect or involve the merits of the action, and consequently no appeal from it will lie, and we have no jurisdiction of the appeal.

Assuming, however, that we do have jurisdiction of the appeal, I think the majority opinion is clearly erroneous in reversing the judgment of the trial court. The conclusion is reached in the majority opinion by consideration of what the author of the opinion has seen fit to designate as "physical facts" but which, it occurs to me, are but isolated circumstances which have been testified to as relating to the ownership of the Tankersley Investment Company stock. The majority opinion has gleaned from the evidence five so-called "physical facts" which support Dan Tankersley's contention and then states "There are some physical facts on which Earl relies", and then enumerates two such facts. That ratio of five to two should not be determinative of this appeal.

From all of the evidence it appears without substantial dispute that the two brothers, Earl and Dan Tankersley, were, prior to 1940, owners of the capital stock of two corporations: Tankersley Investment Company, which was organized in 1929, and at the time of the trial owned a certain apartment building in the city of Tulsa, which was its sole property; and Tankersley Construction Company, organized in 1932, which was engaged in the construction business. The stock was owned by the brothers in an equal number of shares except that one share of Earl Tankersley's stock in each corporation was held in the name of a third party in order to enable such party to be a director and officer of such company. During the year 1939 this share of stock was in the name of Edward Box, an attorney in Oklahoma City, who was secretary of Tankersley Investment Company, and was the attorney for said company and for Dan Tankersley individually. It further appears that from 1939 to 1940 the Con-

struction Company had done little, if any, business and was heavily indebted. The Investment Company was also heavily indebted, its property being encumbered by several large mortgages. Prior to 1940 it had been the custom of both brothers to check against the account of Tankersley Construction Company, and at some time in the latter part of 1939 Dan Tankersley, who was the president of both companies, advised Earl that the company was heavily indebted and that no more checks were to be written against its account. In the latter part of December, 1939, Dan discovered that Earl had written additional checks against the account and talked to him about the matter. At that time Earl advised him that practically all his assets, including an insurance policy and an oil payment owned by him, had been put up as security for debts of the Construction Company, and that it had been necessary for him to check against the Construction Company's funds for reasons deemed by him sufficient. From this point the testimony of the parties is sharply conflicting. Dan Tankersley testified that upon discovering the writing of the checks by Earl in the latter part of December he went to see Earl, who was at that time employed by the Home Owners Loan Corporation; that he told Earl that the practice of writing checks against the Construction Company must stop; that it was heavily indebted, and that it was necessary to raise additional funds to placate its creditors; that Earl advised him that, as above stated, all his assets were held as security for the corporation's debts and he could not raise additional funds; that thereupon he, Dan, informed Earl that he wished to purchase Earl's stock in the two corporations, or to sell his stock in each to Earl, and that Earl asked for time to think it over. Dan testified that after Earl had thought the matter over for several days Earl agreed to sell to Dan all his stock in both corporations if Dan would release his oil payment held by the Liberty National Bank as security for a note of the Construction

Company, pay all of Earl's income taxes for 1939, give him certain construction equipment and take over the debts of the corporations; that he agreed to Earl's proposition and caused the oil payment to be released, the income taxes to be paid, cancelled the indebtedness of Earl to the Construction Company and delivered the specified equipment. He further testified that Earl delivered to Edward Box, Dan's attorney, his stock in both corporations; that he saw the stock in Box's office in Oklahoma City, and that later when he demanded the stock Box stated that he was unable to find it and that it had been misplaced or lost. Evidence introduced by Dan shows that, on January 3, 1940, he procured the release of the oil payment belonging to Earl; that Earl's 1939 income taxes were all paid, and that his indebtedness to the Construction Company was liquidated or charged off. It does not appear, however, that Earl was released from all liability on various debts of the corporation for which he had made himself personally liable along with Dan. This was substantially all the testimony introduced by Dan except that he introduced the testimony of two or three creditors of the Construction Company who testified that in the early part of 1940 they had been advised by Earl that he had nothing to do with the Construction Company's affairs and that they should take up the matter of their indebtedness with Dan. There is no such evidence as to the Investment Company.

Earl testified that he did not, in the conversation with Dan, discuss the sale of his stock, and that no agreement to sell Earl's stock was reached; that Dan told him that he would get the oil payment released if Earl would stop writing checks against the Construction Company and that he agreed, and after the oil payment was released he wrote no more checks against the Construction Company account. He further testified that the payment of the income tax of both was customarily made by the Construction Company, and that he assumed that such payment had been made in the usual course of business. He testified that the question of disposing of the stock was first discussed with him by Edward Box sometime in the spring of 1940; that only the stock in the Construction Company was considered or discussed; that pursuant to such understanding he delivered his stock in the Construction Company to Box to be held in escrow pending the completion of the negotiation for its sale to Dan and that Dan or the Construction Company delivered to him some construction equipment, but that said equipment was not in good condition and did not include certain items specified by him, and that at a meeting in the office of Mr. Box later in 1940, he offered to return it to Dan and refused to deliver to Dan his Construction Company stock.

From the record it appears that on October 7, 1941, Earl Tankersley brought an action in the district court of Oklahoma county to establish his ownership of one-half of the stock of Tankersley Construction Company and for an accounting, and that after the hearing in the district court on an application for the appointment of a receiver, the district court held that the evidence produced by Dan failed to establish the purchase by Dan of Earl's stock in the Construction Company, and that thereafter said action was settled by the parties, who entered into a written contract of compromise whereby for a money consideration Earl transferred his stock in the Construction Company to Dan. That contract is dated March 2, 1942, and therein it is expressly provided that:

"It is not intended by this agreement and settlement to settle, compromise, adjust, release or affect in anywise the status of the afffairs, claims, disputes, or controversies of the parties hereto in connection with the Tankersley Investment Company, a corporation".

Earl admitted that in his testimony at the hearing before the district court

of Oklahoma county he might have stated that his negotiations with Dan included both the Construction Company and the Investment Company stock, but that such statement was not correct and was due to confusion or misunderstanding on his part, and that he had never at any time considered disposing of his stock in the Investment Company.

The testimony of Box, who at the time of the trial of this cause was one of the attorneys for Earl Tankersley, having theretofore severed his connection with Dan, shows that he had never had the Investment Company stock in his office; that he acted as the representative of Dan in attempting to purchase Earl's interest in the Construction Company; that he prepared two contracts in reference to the acquisition of such stock, one dated in January, 1940, which involved only the stock of the Construction Company, and one in May, 1940, which involved the stock of both corporations. He testified that these contracts were drawn by him and submitted to Earl Tankersley upon instructions from Dan; that there was ill feeling between the brothers, and that nearly all negotiations looking to the acquisition of the stock by Dan were carried on between Box and Earl Tankersley with Dan's knowledge and approval; that acting for Dan he negotiated with Earl and submitted to Dan certain proposals made by Earl, and submitted to Earl certain counterproposals made by Dan, and that in the course of these negotiations Dan suggested that the stock of the Investment Company be included in the deal. He testified that no final agreement as to the disposition of the stock of Earl in either corporation was ever reached, and that while he never held the stock of the Investment Company in his possession, he did for a time hold Earl's stock in the Construction Company along with certain sewer warrants of the city of Sapulpa, which were to be disposed of in a final settlement; that in the latter part of 1940, or early 1941, these warrants were taken from his office by Dan or his agents, and that he thereupon redelivered to Earl the stock in the Construction Company. It is undisputed that Earl at all times retained in his possession the stock certificates evidencing his ownership of the Investment Company's stock, and that they were never cancelled upon the records of the corporation at any time.

In Oklahoma State Bank of Ada v. Cole, 170 Okla. 64, 38 P. 2d 914, we held that a certificate of stock is prima facie evidence of title to the stock represented thereby. It was, therefore, incumbent upon Dan Tankersley to establish the oral agreement for the purchase of the stock in the Investment Company, and his full performance of such agreement. The trial court found that the evidence did not establish such agreement and the performance thereof by Dan, and examination of the record convinces me that the trial court did not err in so finding and holding.

The testimony of Dan as to his consummation of a deal with Earl in the latter part of December, 1939, or the first part of January, 1940, is contradicted by the testimony of Box and Earl, and by the fact that negotiations for the acquisition of the stock continued until late in the year 1940. If, as testified by Dan, a definite agreement between the parties was reached in December, 1939, which was performed by him by the releasing of Earl's oil payment, the payment of his income tax, and the cancellation of his indebtedness to the Construction Company, it is a reasonable inference that that deal involved only the stock of the Construction Company, since the first contract drawn by Box upon instructions from Dan, which was apparently for the purpose of consummating the oral agreement, referred only to the acquisition of the Construction Company stock. It is also significant that in the contract of March 2, 1942, whereby Earl transferred to Dan his stock in the Construction Company, he reserved all rights as to the stock of the Investment Company.

When the testimony is considered as a whole, it is apparent that the acts of Dan in releasing the oil payment, paying the income tax, and agreeing to and delivering certain equipment to Earl, if, in fact, these were considerations moving from Dan to Earl for the acquisition of Earl's stock, were done for the purpose of acquiring only the stock of the Construction Company, in which Dan was primarily interested. A careful study of the record convinces me that the judgment of the trial court that Earl was the owner of the stock in the Investment Company is not clearly against the weight of the evidence.

Dan Tankersley makes a further contention that the trial court erred in permitting the witness, Box, to testify to communications made to him by Dan while he was acting in the capacity of Dan's attorney, on the ground that such communications were privileged.

The general rule is that confidential communications made by a party to his attorney in the course of professional employment cannot be divulged by the attorney without the consent of the client. 70 C. J. 397, §532.

But statements made by a party to his attorney to be communicated to others, or to be made public, are not privileged. 70 C. J. 426, §569, and cases cited in Note 42; 28 R. C. L. 563, §152; Moran v. Thurman, 127 Kan. 688, 275 P. 160; Franzen v. Shenk, 192 Cal. 572, 221 P. 932.

This court has repeatedly held that for communications by a party to his attorney to be considered confidential, and to enable such party to invoke the relationship of attorney and client to bar the attorney from testifying to such communications, such communications must be made in confidence because of such relationship, and under such circumstances as to imply that they were to be kept secret and confidential by the attorney. Ratzlaff v. State, 122 Okla. 263, 249 P. 934, 937; Howsley v. Clark, 167 Okla. 371, 29 P. 2d 947; McCaw v. Hartman, 190 Okla.

264, 122 P. 2d 999. The testimony of Box related entirely to matters in connection with the acquisition of Earl's stock by Dan, and communications made by each to him with the intent that they should be by him transmitted to the other. He testified to nothing that was secret or confidential. The trial court correctly held that the communications were not privileged and denied the objection of Dan Tankersley to the competency of Box as a witness.

The trial court heard all of the witnesses, determined their credibility and "evaluated" their testimony, as it was its rights to do.

I think that the judgment is not against the clear weight of the evidence and should be affirmed.