OSCN Found Document:OIL VALLEY PETROLEUM v. MOORE

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 OIL VALLEY PETROLEUM v. MOORE
2023 OK 90
Case Number: 119810
Decided: 09/19/2023
As Corrected: October 3, 2023
OIL VALLEY PETROLEUM, LLC,

Cite as: 2023 OK 90, __ P.3d __

 

 

Plaintiff/Appellant,
v.
CLAY E. MOORE, an individual, or his Heirs, Executors, Administrators, Trustees, Devisees, Successors, Agents, or Assigns, Defendant/Appellee.

CERTIORARI TO THE COURT OF CIVIL APPEALS, DIVISION I

¶0 Plaintiff filed a proceeding in the District Court for Dewey County and requested the trial court to quiet title, cancel an oil and gas lease, and declare its top-lease to be in force and effect. Defendant moved for summary adjudication. Plaintiff also moved for summary adjudication. The Honorable Celo J. Harrel, Associate District Judge, granted defendant's motion and denied plaintiff's motion. Plaintiff appealed and the Court of Civil Appeals reversed the judgment of the District Court and directed judgment for plaintiff. Defendant sought certiorari to review the opinion by the Court of Civil Appeals, and certiorari was granted. We hold: (1) Exhibits presented during summary adjudication proceedings were insufficient to show a material fact that a well was commercially profitable for the purpose of the habendum clause of an oil and gas lease; (2) An overriding royalty interest may be extinguished by an extinguishment of the working interest from which it was carved by a lessee's surrender of the lease in substantial compliance with the lease, unless the surrender is the result of fraud or breach of a fiduciary relationship; and (3) Prevailing party status for the purpose of an attorney fee is determined in the trial court when not determined on appeal.

CERTIORARI PREVIOUSLY GRANTED; OPINION OF THE COURT OF CIVIL
APPEALS VACATED; ORDER OF THE DISTRICT COURT REVERSED;
AND CAUSE REMANDED FOR ADDITIONAL PROCEEDINGS

Joseph M. Vorndran, Breanne M. Gordon, Stuart & Clover, PLLC, Shawnee, Oklahoma, for Plaintiff/Appellant.

Michael Kelly, Long, Claypole & Blakley Law, PLC, Enid, Oklahoma, for Defendant/Appellee on appeal and certiorari.

Jana Knott, Bass Law, Oklahoma City, Oklahoma, for Defendant/Appellee on certiorari.

Kraettli Q. Epperson, Mee Hoge PLLP, Oklahoma City, Oklahoma, Amicus Curiae.

EDMONDSON, J.

I. Introduction and Summary

¶1 Plaintiff, Oil Valley Petroleum, LLC, (Oil Valley) and defendant, Clay Moore, (Moore), sought equitable relief in the District Court to adjudicate title based upon two oil and gas leases. Their arguments may be simplified: (1) Oil Valley claims its title is based upon a top-lease and a release by a lessee of its interest in a well; and (2) Moore claims his title is based upon the base or bottom lease and production from that same well, with an added allegation of unclean hands by Oil Valley. Oil Valley claims a release creates a washout of Moore's interests because the released well was the only well keeping the lease in effect during the secondary term of the lease. As we explain, Moore and the amicus curiae use the term "washout" to describe an interest in a lease that is extinguished with an added element of alleged wrongfulness by the person causing the extinguishment. Moore states production from the well kept the lease in effect regardless of the release.

¶2 Amicus curiae on certiorari correctly identifies the issues presented to us by the parties: Whether a lessee's release of a lease may extinguish another's interests in the base oil and gas lease when a claim is made of continuing production holding the lease, and whether this production may be used to show a party's "unclean hands" or constructive fraud in obtaining the release. Amicus curiae indicates a quiet title proceeding is a form of equitable relief, and all circumstances must be considered.[1] Moore and amicus curiae appear to argue the fact of production would necessarily show a type of fraud or estoppel relating to a release. However, because elements for fraud or estoppel theories are not identified as such for facts specific to Moore's claim, their argument may also be read as indicating production from the well and conduct of the parties relating to the release are simply two of several factors to be considered supporting a claim in equity to quiet title and cancel an oil and gas lease. We agree that a trial court proceeding in equity must consider all circumstances when parties seek to cancel an oil and gas lease and adjudicate title.

¶3 The parties used a partial summary adjudication procedure for a decision by the trial court. Moore sought and was granted partial summary relief. Although he argued the well was producing, he did not supply facts necessary to show the well was commercially profitable. The fact of commercial profitability was raised and disputed by Oil Valley during the partial summary relief proceedings. Moore's allegation of Oil Valley's unclean hands was not addressed in the summary relief proceedings other than what appears to be a legal conclusion by Moore based upon his allegation the well continued to produce, and that Oil Valley obtained both the top-lease and the release. Moore did not address when facts are sufficient to show unclean hands, estoppel, or a constructive fraud. Oil Valley did not address whether fraud or breach of a fiduciary duty may invalidate a lessee's release of an interest in a lease.

¶4 We may address a trial court's grant of interlocutory summary relief when an appeal is brought from a subsequent judgment.[2] The interlocutory order granting movant's motion for partial summary relief occurred when the parties expressly disputed a fact material to the movant's motion, e.g., whether the well was commercially profitable. This order must be reversed.

¶5 The trial court also pronounced a subsequent final order that granted judgment to Oil Valley on a counterclaim raised by Moore. The parties did not supply in the appellate record any of their trial court motions used by the trial court when adjudicating this counterclaim. There is no discussion by the parties whether this final adjudication relied in any part, or to any degree, on the interlocutory partial summary adjudication reversed herein. We do not address the final order.

¶6 Oil Valley sought partial summary relief on the quiet title claim and its request was denied. Oil Valley raised the fact of the release, claimed the well was not producing, and argued Moore was required to commence drilling operations and produce after the release was filed in Dewey County. Oil Valley did not address elements to a claim in equity to cancel an oil and gas lease based upon all of the circumstances in the controversy. Oil Valley does not show on appeal that its request for partial summary relief is within a narrow category of appellate review when a trial court's denial of summary relief is reversed on appeal.

¶7 We hold: (1) Exhibits presented during partial summary adjudication proceedings were insufficient to show a material fact that a well was commercially profitable for the purpose of the habendum clause of an oil and gas lease; (2) An overriding royalty interest may be extinguished by an extinguishment of the working interest from which it was carved by lessee's surrender in substantial compliance with the lease, unless the surrender is the result of fraud or breach of a fiduciary relationship; and (3) Prevailing party status for the purpose of an attorney fee must be determined in the trial court. We also conclude we will not make a first instance adjudication of rights and obligations of parties to a lease and top-lease when the facts were not developed in the trial court equitable proceeding and are not before us in the appellate record.

II. First Lease, First Well, Assignments, Release, Second Lease, and Second Well

¶8 Waban Oil Corporation (Waban) executed an oil and gas lease to Athan Inc. (Athan) in 1980. The Athan lease covered a one-half interest in the minerals in and under the SW/4 of Section 24, Township 17 North, Range 14 West of the Indian Meridian in Dewey County, Oklahoma. Athan assigned all of its interest in the Athan lease to Mustang Production Company, approximately two weeks later on March 24, 1980.

¶9 The Ball #1-24 well was drilled to a depth of 9,700 feet, and completed in February 1981 for producing gas and gas condensate. Completion of the well occurred during the three-year primary term in the Athan lease. The Oklahoma Corporation Commission created a 640-acre drilling and spacing unit for Section 24, T17N-R14W, and included the Ball #1-24 well.

¶10 Mustang made two assignments and divided its interest in the Athan lease based upon depth from the surface and also created an override interest. Mustang's first assignment was made in June 1981 to Funk Exploration. Mustang assigned its "right, title and interest" in the Waban Athan lease "from the surface of the earth to the stratigraphic equivalent of 9,747 feet (being the total depth drilled and logged plus 50' ), . . . in the Ball #1-24 well."[3] Mustang also reserved a 1/8 of an 8/8 overriding royalty interest in this assignment, and the assignment was made subject to a previous farmout agreement between Mustang and Funk.

¶11 Mustang's second assignment was made approximately ten years later in November 1991 (effective Jan. 1, 1992), by its successor, Mustang Fuel Corporation, to Clay E. Moore (Moore). Mustang assigned "all of Assignor's interest" created by "lessor Waban Oil Corporation" (i.e., the Athan lease), excluding rights to wells and wellbore rights retained by the assignor.[4] In summary, Mustang assigned both (1) its remaining interest in Waban's Athan lease below the stratigraphic equivalent of 9,947 feet, and (2) Mustang's remaining 1/8 overriding royalty interest.

¶12 Mustang's first assignment with its assignment of shallow rights[5] to Funk Exploration in 1981, i.e., "from the surface of the earth to the stratigraphic equivalent of 9,747 feet including the Ball #1-24 well," was subsequently possessed by Staab Holdings, LLC, (Staab), "as successor to Funk."[6] In October 2017, Staab executed, but did not file, a "Release of Oil and Gas Lease" for "all of its rights, title and interest in and to the oil and gas leases hereinafter described;" and then described Waban's lease to Athan and one additional lease. Staab's release was filed in the Dewey County records on March 5, 2018.[7]

¶13 In June 2017, Waban, as lessor, executed a second oil and gas lease for property described in the Athan lease. The lessee is plaintiff, Oil Valley Petroleum, LLC (Oil Valley). Both Moore and Oil Valley view this second lease as a "top-lease" when it was executed in June 2017. A "top-lease" is a lease subject to a pre-existing lease that has not expired,[8] and the parties agree the Athan lease was in effect the date the top-lease was executed.

¶14 Based on Oil Valley's subsequent actions, the Corporation Commission granted a drilling permit for the Holsapple #1-24-13XH well (Holsapple Well) to Council Oak Resources, LLC (Council Oak). The permit to drill was granted on May 21, 2018, and this well was completed at a vertical depth of 11,524 feet.

¶15 The parties agree the lease and assignments occurred, that a release was filed, and a top-lease was created. However, this agreement appears to be partially inconsistent with part of Moore's argument during the partial summary adjudication proceedings which referenced "other working interest owners" in the Ball #1-24 well. The parties disagree on the effect of the March 2018 release on the 1980 Athan lease, e.g., whether Moore's rights were extinguished by the release.

III. District Court Proceedings, Appeal, and Certiorari

¶16 In July 2018, Oil Valley filed this proceeding in District Court of Dewey County to quiet title in its favor, cancel the Athan lease, and declare the second lease by Waban, the June 2017 top-lease, to be in full force and effect. The controversy is between Oil Valley claiming rights pursuant to the release by Staab and the top-lease, and Moore claiming rights below the stratigraphic equivalent of 9,947 feet based upon the Athan lease, an assignment to him from Mustang, and production from the Ball #1-24 well.

¶17 Moore requested "summary judgment" on the quiet title issue concerning the continued effect of the Athan lease and on the "present effect" of the top-lease. Moore argued the Ball #1-24 Well "is and has been continuously producing and/or capable of producing in paying quantities since completion through November 2018."[9] The motion refers to attached Exhibit "E" purporting to show recent production with a reporting date of "5/2018," and attached Exhibit "F" a January 2019 revenue disbursement statement showing a payment to Moore from an operating company based upon production for the last quarter of 2018 based upon Moore's interests in three different wells.

¶18 Exhibit "F" shows a value of $24.91 attributed to Moore's override in the Ball #1-24 well during November 2018, and a check paid to Moore in the amount of $145.87 for production from three wells which included the Ball #1-24. However, Moore also attached Exhibit "G" with information from the Oklahoma Tax Commission's PUN form (Production Unit Number form) to show production from the Ball #1-24 well. The PUN form for the well in 2018 shows production in January, March, and May of 2018, but no production during the last seven months of 2018. Moore's Answer in the District Court pled that Golden Gas Service Company is the operator of the Ball #1-24 well, and Moore's motion for summary relief states he has received "remittance advices from DCP Operating Company, LP" for production as recent as November 2018.

¶19 Oil Valley responded and also sought "summary judgment" on the quiet title issue of the Athan lease and the top-lease. Oil Valley argued Staab's release caused Moore's interest to be "completely extinguished pursuant to the express terms of the original oil & gas lease from which his interests' validity depended."[10] Further, that Moore's deep leasehold rights from the Athan lease were undeveloped,"were held by production from the Shallow Rights, [and] when gas production from the Lease ceased (via the Release), it effectively nullified the entire [Athan] Lease."[11]

¶20 In addition to invoking the Athan lease's surrender clause, Oil Valley made an additional three arguments. The first two are: (1) The terms of the Athan lease's habendum clause required a well to be capable of production "by the lessee" which did not continue after the release was filed; and (2) The Athan lease contains a drilling and reworking sixty-day cessation of production clause by a lessee for keeping the Athan lease in effect, and no further drilling or reworking activity occurred pursuant to the Athan lease prior to and after the release. In other words, Staab's release of the Athan lease's "shallow rights" with its Ball #1-24 well caused the following results: (1) No Athan lessee continued production pursuant to the lease's habendum clause; and (2) No Athan lessee, including Moore as to his deep rights, satisfied the cessation of production clause to preserve the Athan lease by commencing drilling in the 60-day period after Staab's release was filed. In summary, Oil Valley argued the top-lease ripened or became effective after this 60-day post-release period without commencement of production by a lessee on the Athan lease.

¶21 A third argument by Oil Valley was Moore failed to produce any facts concerning the costs associated with production from the Ball #1-24 well. Oil Valley agreed Moore had received $24.91 from production in November 2018. Oil Valley pointed to Moore's deposition stating he had not reviewed "any expense information from the Ball #1-24 Well." Oil Valley argued Moore's motion for summary judgment failed to address profitability of the Ball #1-24 well, and that production in paying quantities for the purpose of the Athan lease means, in part, production must be in paying quantities for cost-bearing interests. In other words, a lease-based obligation of owners of working interests to produce must include whether an ability to create a profit exists.

¶22 Moore replied and argued information submitted showing a "record of production" showed the well was capable of producing in paying quantities. The reply did not point to any exhibit showing costs associated with the Ball #1-24 well or its profitability. Moore stated in his deposition he had been informed that the well was a "profitable well" when he telephoned an operator for an opinion.

¶23 Moore's reply argued the Staab release had the effect of releasing only one part of the Athan leasehold: "A voluntary release of a small portion of the acreage, or an individual formation, could have no effect on all the other acreage and all the other formations which had become subject to the continuing production clause of the Lease."[12]

¶24 Moore also argued the other operator and other working interest owners in the Ball #1-24 well continued to produce from the well, "which would continue to hold the Athan Lease."[13] Generally, the phrase "working interest" "unequivocally implies the right to 'work' or do the things necessary to producing, the lease and helps distinguish such an interest from one which does not carry with it that right."[14] A working interest is one of those rights usually created as part of a cluster of rights granted to a lessee in an oil and gas lease. For example, the lease "does not operate as a conveyance of oil and gas in situ but constitutes merely a right to search for and reduce to possession such of these substances as might be found . . . it is really a grant in praesenti of oil and gas to be captured in the lands described during the term demised and for so long thereafter as these substances may be produced."[15] Moore makes his reference to other working interest owners with a reference to "the other operator." These references are not accompanied with facts showing whether the operator and other working interest owners possess interests based upon (1) privity of estate arising from the Athan lease, or (2) privity of contract arising from some type of operating agreement or other contract, or (3) both privity of estate and privity of contract.[16]

¶25 Moore's reply also states several additional facts not supported by any exhibits. Moore states the following.

The "facts" are that . . . D. When Oil Valley obtained a release of the Athan shallow leasehold rights from Staab in October, 2017, it did not "automatically" release the Deep Rights held by Moore, as Staab had no interest in nor power to release rights he did not own. . . F. Staab's release of only its rights in the Athan lease, which was only in the Southwest Quarter, had no effect on Staab's and any other party's rights in the rest of Section 24, nor on the rights of those other lessees to continue producing from the Ball 1-24 wellbore on the Southwest Quarter, and thus maintain all leases in Section 24 in force.

Moore's Reply on summary adjudication at.5. The argument references "other lessees . . . producing from the Ball 1-24 wellbore," but does not tie this language to a stated identifiable interest arising from the Athan lease. Moore states this production continued "through at least November 2018, which was several months after the new Holsapple well was commenced in May, 2018, on section 24."[17]

¶26 Moore and Oil Valley filed supplemental briefs on the effect of Staab's release on Moore's interests. Moore relied on a 1974 opinion from the Louisiana Supreme Court and a 2015 opinion from an Ohio appellate court.[18] Oil Valley relied on a 2004 opinion from the Texas Supreme Court and a 1995 appellate court opinion from Texas.[19]

¶27 The trial court granted Moore's motion for summary judgment, and denied Oil Valley's motion for summary judgment. Moore's Answer included a counterclaim to quiet title, and damages for slander of title and tortious interference with business relations. The trial court's adjudication in July 2019 on Moore's summary judgment motion did not expressly include his claims for damages.

¶28 In August 2021, the trial court denied Moore's "motion for partial summary judgment" on his claim for tortious interference with business relations. The trial court also granted Oil Valley's "counter motion for summary judgment" on Moore's claim for tortious interference with business relations. Motions, if any, specifically addressing slander of title or tortious interference are not included in the record on appeal, and we do not review the August 2021 order granting Oil Valley's counter motion.

¶29 Oil Valley appealed. The Court of Civil Appeals reversed the judgment of the trial court, and concluded the trial court should have granted Oil Valley's motion for summary judgment. Moore filed a petition for certiorari to review the opinion by the Court of Civil Appeals, and the petition was granted.

¶30 Moore's petition for certiorari asserts: (1) Moore's "deep rights" were preserved by production from the Ball #1-24 well pursuant to the habendum clause in the Athan lease; (2) The Staab Release "had no legal effect on his [Moore's] interests" as to both his override interest in the Athan lease and his "Deep Rights;" and (3) Even assuming Staab's release did destroy Moore's override and deep lease rights in the Athan lease, the appellate court allegedly made an improper finding of fact concerning the Athan lease's cessation of production clause because "the District Court did not determine whether the 'continuous drilling clause had even been triggered in the case because the lower court concluded that Staab's release of the shallow rights did not release Moore's interests because Moore's interests continued to be held by production."

¶31 Oil Valley's answer to the certiorari petition discusses the nature of Moore's interests, the habendum clause, and Staab's release. Oil Valley construes the appellate opinion's reference to additional drilling as a comment on Moore possessing a right to drill to the formation depth Moore possessed under the Athan lease after the Staab release was filed, provided Moore complied with a continuous drilling clause in the Athan lease. Oil Valley's answer on certiorari also asserts that after Staab's release was filed "[a]ny further production from the Ball 1-24 well was produced pursuant to Oil Valley's Top Lease."

¶32 Moore's reply on certiorari objects to Oil Valley asserting "as a material fact" that "'[i]mmediately upon Staab's filing of the Release of Oil & Gas Lease' on March 5, 2018, 'all production ceased from the Ball #1-24 well pursuant to the Base Lease." Moore states this "is a misstatement of basic oil and gas principles" as opposed to a statement of fact. Moore argues the cessation of physical production from the well was required to commence the effect of the 60-day continuous drilling clause.

¶33 Amicus curiae filed a brief in support of the petition for certiorari and argues a washout of an overriding royalty interest should be protected from constructive fraud.

IV. Standard of Review

¶34 Our review of an order granting an interlocutory partial summary adjudication upon appeal of the subsequent judgment is similar to our review of a motion for summary judgment, and we examine the trial court submissions actually used by the parties and the trial court to adjudicate the motion.[20] A motion for summary judgment may be used in a proceeding in equity,[21] and a partial summary adjudication, often known in trial court parlance as a "motion for partial summary judgment," may be used in equity. Oil Valley's quiet title claim and Moore's quiet title counterclaim presented by opposing motions for partial summary adjudication invoked the trial court's equitable cognizance.[22]

¶35 When a trial court's summary judgment is based upon an issue of law adjudicating the meaning of contractual language, then we exercise a de novo appellate review of an assignment of error challenging the trial court's legal conclusion.[23] The partial summary relief granted to Moore was based upon language in the lease construed as an issue of law by the District Court. The partial summary relief granted to Moore receives a de novo appellate review on an issue of law.[24]

¶36 Oil Valley argued a material fact was missing from Moore's partial summary adjudication motion which sought to enforce the habendum clause, e.g., Oil Valley argued the fact of profitability from production was not raised by Moore in his request for summary adjudication. Moore, as a moving party granted summary adjudication, had a burden to establish that no dispute as to a material fact existed.[25] The moving party for summary adjudication presents an issue of fact as undisputed, and the "opposing litigant must then identify those material facts he or she alleges remain in dispute and tender supportive evidentiary materials."[26] Oil Valley's approach to this issue is that its burden to produce facts and refute profitability of the well on summary judgment does not arise until Moore as movant satisfies his initial burden to show profitability of the well as a fact necessary to Moore's cause seeking to enforce the habendum clause against Oil Valley.

¶37 Summary judgment is an adjudication on the merits of the controversy.[27] A summary judgment is based upon a determination that all elements of the moving party's cause of action are present.[28] The absence of a single element in the moving party's cause of action is sufficient defense to the motion.[29] Elements of a cause of action adjudicated by summary process must be supported by those facts material to those elements; and "a fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of an adjudicated cause of action or defense asserted by the parties."[30] An adjudication defining the elements to a particular cause of action presents a question of law.[31] Whether production profitability is an element for enforcement of the habendum clause presents a question of law and receives de novo appellate review.

¶38 An oil and gas lease is construed as a contract.[32] We give effect to the plain and ordinary meaning of words unless a technical term is used to convey a specific technical concept.[33] We follow the parties' intent from the four corners of the instrument at the time the contract was executed,[34] in light of the applicable law incorporated into the contract.[35] We construe an oil and gas lease to give effect to the intent of the parties and effectuate the purpose of contract actually made.[36]

¶39 The trial court both granted and denied requests for partial summary adjudication. The denial of a motion for summary judgment is generally not appealable, including after a trial on the merits, except in certain circumstances where a judgment on a cause of action is required as a matter of law.[37] Oil Valley argued judgment must be denied to Moore and granted to Oil Valley in the appeal due to a single issue law, e.g., the legal effect of a lessee's release of an interest in an oil and gas lease. We conclude Oil Valley's claim in equity does not rest upon a single issue of law requiring a judgment in appeal on its quiet title clam.

V. Analysis
V(A). Partial Summary Relief Granted to Moore

¶40 In summary, Moore argued his overriding royalty interest in shallow zone production from the Ball #1-24 well and his assigned interest in a deeper zone continued in effect, or were "held," by the production from this well. Moore relied upon the habendum clause in the Athan base lease

¶41 The phrases "base lease" or "bottom lease" are often used to identify an earlier oil and gas lease which controls or defines oil and gas rights in subsequent conveyances involving the same leased premises.[38] Generally, an assignment of lease rights creates no greater interest for the assignee than the interest possessed and assigned by the assignor.[39] The parties agree the 1980 Athan lease is a base lease for subsequent conveyances of rights based upon the rights conveyed by the Athan lease.

¶42 The Athan lease contains a clause stating the lease will remain in force for three years as the primary term, and as long thereafter oil and gas or either of them is produced by the lessee. This language specifies a primary term with a habendum clause. The phrases "primary term" and "habendum clause" have well-known meanings in our jurisprudence.

¶43 One court has explained an incomplete but useful definition for a "primary term" as the period of time stated in the lease "during which the lease may be kept alive by a lessee by virtue of drilling operations or the payment of rentals, even though there is no production in paying quantities, . . . [and] is also a period of time at the end of which the estate granted will terminate but which estate may be extended by some other provision, usually one for production."[40] In Hall v. Glamor, 2018 OK 59, 427 P.3d 1052, we noted the habendum clause in an oil and gas lease defines the lease's primary term and usually extends the lease for a secondary term of indefinite duration as long as oil, gas, or other minerals are being produced.[41] After the primary term, a lease is effective based upon a well capable of production in paying quantities such that the lease remains viable under the habendum clause, which defines the duration of the lease in relation to the production life of the well. Id. 2018 OK 59, ¶21, 427 P.3d at 1063.

¶44 In Rist v. Westhoma Oil Co., 1963 OK 126, 385 P.2d 791, we explained if a base lease does not distinguish among formations and depths, and subsequent conveyances create in different parties different shallow and deep rights relating to that base lease, then "delay rentals paid by the owners of the above-sea level leasehold served to extend the lease year to year during the primary term as to all horizons." Id. 385 P.2d at 796. We explained the parties entered into a lease agreement for a primary term "to be extended on production" from the area described "with no thought in mind of a severance as to horizontal divisions." In summary, if one lessee performed a lease-created obligation towards the lessor which continued the life of a base lease between lessor and lessee as to one lessee of a horizontal interest; then a second lessee possessing a different horizontal interest could rely on the first lessee's performance to preserve the life of the base lease as to the second lessee.

¶45 Several years later in 1982, we addressed circumstances where a mechanical difficulty caused a cessation of production and then a second well drilled to the same formation continued production. State ex rel. Commissioners of the Land Office v. Amoco Production Co., 1982 OK 14, 645 P.2d 468. We expressly agreed with the reasoning in Amoco Production Company v. Braslau, 561 S.W.2d 805 (Tex.1978), where a mechanical difficulty caused a casing collapse inside the well bore, and a second well was drilled, "even drilled to a different formation, kept the lease alive." State ex rel. Commissioners v. Amoco Production Co., 645 P.2d at 471.

¶46 A few years later our Court of Civil Appeals relied on Rist in Martens v. Kaiser--Francis Oil Co., 1989 OK CIV APP 3, 768 P.2d 383, and explained if a lease does not distinguish among horizontal formations and depths, a well drilled in a unit of production and the leased premises in one formation will satisfy the lessor-lessee obligation to produce as to other horizontal formations in the same leased premises developed as a unit. We recently noted in Hall v. Glamor, supra, the application of 52 O.S. §87.1(b), (a statutory Pugh clause), and its 1977 amendment for spacing units 160 acres and greater meant "leased lands lying outside of the drilling and spacing unit would no longer be held by production over ninety days beyond the expiration of the primary term of the lease," and this statutory change was a departure from the previous law.[42]

¶47 Both parties agree that satisfaction of a base lease habendum clause by production from one formation in a leased premises by a lessee may satisfy the base lease habendum clause as to another formation in the same leased premises. Oil Valley asserts Moore's overriding royalty interest and deep rights interest could be held by production from the shallow Ball #1-24 well, but could not be held by that well after the release was filed by Staab. The parties do not expressly discuss if Moore had a duty to Athan to develop the deeper zones between January 1, 1992, and the date Staab's release was filed twenty-six years later on March 5, 2018. However, one of Moore's arguments appears to indicate Oil Valley's Holsapple Well satisfies Moore's duty. Predictably, Oil Valley states the Holsapple Well was not drilled by Moore, as a lessee by assignment, and the well satisfies no duty owed by Moore arising from the Athan lease. Oil Valley also asserts any production from the Ball #1-24 well after the date of release was filed is deemed to be production by Oil Valley from the well pursuant to the top-lease.

¶48 Both parties agree satisfaction of the Athan lease habendum clause by production from one formation in a leased premises satisfies the base lease habendum clause as to another formation in the same leased premises. This agreement concerning the Athan lease does not contravene public policy on the basis of Rist v. Westhoma Oil Co., supra, and is part of this controversy as shaped by the parties for our review.[43] We agree with the parties that production from the shallow well could hold or preserve Moore's rights in the Athan lease. However, Oil Valley objected to Moore's use of the habendum clause for a summary judgment without Moore showing the Ball #1-24 well was commercially profitable. We agree that keeping the base lease viable by the habendum clause is not by mere production, but a commercially profitable production which is often referred to as "production in paying quantities."

¶49 In Pack v. Santa Fe Minerals, 1994 OK 23, 869 P.2d 323, we quoted from Hoyt v. Continental Oil, 1980 OK 1, 606 P.2d 560, and noted "our commitment 'to the principle that production means production in paying quantities in Oklahoma when the term appears in the habendum clause of an oil and gas lease.'" Pack, 1994 OK ¶23, 869 P.2d at 323. In Mitchell v. Amerada Hess Corp., 1981 OK 149, 638 P.2d 441, we discussed an operator's lack of a duty to drill an additional well after paying production is obtained, a prudent operator expecting a probability of potential profit, and one purpose for an oil and gas lease is "to make the extraction of oil and gas from the leased lands of mutual advantage and profit to the lessor and lessee." Id. 638 P.2d at 448-50 (emphasis added). In Tres C, LLC v. Raker Resources, LLC, 2023 OK 13, 532 P.3d 1, we discussed a time period over which profitability on an oil and gas lease should be determined. Id. 2023 OK 1, ¶¶30-31, 532 P.3d at 17-18. We have explained a well's profitability is an element to a cause of action seeking to construe and apply the habendum clause in an oil and gas lease with an active well, and capability of profit for production is an element when construing a cessation of production clause with a shut-in well.[44]

¶50 Moore supplied an exhibit showing a value of $24.91 attributed to Moore's override in the Ball #1-24 well during November 2018. We have explained an overriding royalty interest is such that only when oil and gas are reduced to possession does the interest attach, and "prior to this event the owner of an override has no assertable right in the leasehold."[45] An overriding royalty interest is often defined as: "a certain percentage of the working interest which as between the lessee and the assignee is not charged with the cost of development or production,"[46] and argument relating to when a cost may be charged to an overriding royalty has not been made by any party.[47]

¶51 The payment of $24.91 for Moore's overriding royalty interest, by itself, does not show the well's commercial profitability. Moore also supplied additional documentation showing production. However, this documentation was not placed in any economic context regarding cost of production, and nothing before the trial court shows profitability of the well. Additionally, two of the exhibits presented by Moore, "F" and "G" appear to conflict on whether production last occurred in either May or November 2018.

¶52 We have also explained a well must be capable of producing in paying quantities, and "the viability of a mineral-interest lease depends largely upon whether a well is capable of production in paying quantities, i.e., the characteristic that distinguishes a 'shut-in' well from a well experiencing a 'cessation of production.'"[48] If an issue of fact is whether a well is capable to produce in paying quantities or be profitable; then the trial court must make that determination of fact.[49] Moore pled the Ball #1-24 well was capable of producing commercial quantities, but did not provide the factual elements necessary to show this claim in his request for summary relief.

¶53 In summary, the fact of the well's commercial profitability was a material fact for Moore's claim he presented for summary relief against Oil Valley, and the fact was disputed by the parties during the partial summary relief proceedings. For example, Oil Valley argued "neither Plaintiff, nor the Defendant, can accurately plead or assert whether the Ball 1-24 produces and/or is capable of producing in paying quantities at this time."[50] Partial summary relief granted to Moore was error when a material fact to an element for his cause of action adjudicated was not shown and was also disputed. We reverse the partial summary adjudication granted to Moore.

V(B). The Release

¶54 Oil Valley argues it does not matter to Moore's equitable claim whether the Ball #1-24 well was profitable or capable of being commercially profitable. Oil Valley argues Staab's release extinguishes Moore's overriding royalty interest as well as Moore's deep rights as a lessee in the Athan lease. Moore disagrees. Oil Valley and Moore argue the dispositive issue on appeal and certiorari is which of two events takes precedence for title purposes, (1) a producing well as argued by Moore, or (2) a lessee's release as argued by Oil Valley.

¶55 Oil Valley argues Moore has no claim in equity. Oil Valley is mistaken. We have reaffirmed for several decades a party possessing an overriding royalty may challenge a surrender or release when alleging in an equitable proceeding the release or surrender was a result of fraud or a breach of a fiduciary duty.

¶56 Amicus curiae argues the dispositive issue of law in the appeal and on certiorari is whether a lessee in a base lease may file a release of those rights and extinguish an overriding interest and other working interests in the base lease if circumstances of the release constitute a constructive fraud in equity.

¶57 The term "washout" may be used to refer to extinguishing a nonoperating interest, such as an overriding royalty, by another's surrender or release of a lease. However, the term is often used when a party intentionally surrenders the lease and then reacquires the same lease free of the nonoperating interests which are "washed out" by the surrender.[51] For example, one court has explained: "The intentional termination of a lease to destroy a nonoperating interest is a washout tactic. A washout is conduct by an operator designed to extinguish the overriding royalty interest while at the same time preserving the operator's interest."[52] One author has stated that in addition to overriding royalty interests, "washouts can happen to any type of non-operating interest in an oil and gas lease, such as a back-in option, net profits interest, security interest, or a non-operating working interest."[53]

¶58 For several decades, including a time prior to Moore obtaining his assignment, model operating agreements for those possessing an operating interest have often included provisions for abandonment and surrender of a lease as well as renewal or extension of a lease to prevent a washout.[54] Texas courts have stated a washout of an interest may be prevented by the instrument that created the interest, usually by some type of express "anti-washout" clause,[55] and have also stated the owner of the overriding royalty has the burden to include language protecting against a washout.[56] Similar language indicating the availability of contractual extinguishment protection is found in Rees v. Briscoe, 1957 OK 174, 315 P.2d 758. One party expected the opposing party to protect a reserved override when new leases were created, and the Court noted "it would have been easy to have added a few words to the effect that the reservation [of the override] should apply to renewals or extensions of the leases assigned." Id. 315 P.2d at 761 (explanation added). Some courts have viewed a washout as not necessarily wrongful and prohibited by an oil and gas lease, but should be prohibited by express anti-washout provisions if desired by the parties.

¶59 A typical analysis of a washout in the absence of an anti-washout agreement includes an examination of the relationships of the parties to their interests and each other, e.g., the party surrendering a lease, the party whose interests are washed out, and the party obtaining an interest due to the washout. This analysis often examines whether parties possessed a fiduciary or confidential relationship. The analysis may also include whether a release, surrender, or forfeiture was obtained by fraud or collusion when circumstances for such are raised as an issue for adjudication by a party.[57] Amicus curiae uses the term "washout" to describe conduct which is allegedly a constructive fraud, and Moore uses the term "estoppel," but they do not identify elements for a constructive fraud or estoppel claim within the context of the well-known "fraud or breach of a fiduciary relationship" exception for saving an overriding royalty from a lessee's surrender of a lease as noted herein. The parties may address this on remand with an opportunity to present all of the circumstances necessary for their competing claims in equity.

¶60 Moore pled he possessed two very different oil and gas interests, an overriding royalty interest in the Ball #1-24 well and assigned lessee rights in the Athan lease below the stratigraphic equivalent of 9,947 feet. The two interests must be addressed separately when examining a transaction that extinguishes interests created by a lease.

¶61 The nature of an overriding interest has often arisen in litigation involving implied covenants. In XAE Corp. v. SMR Property Management Co., 1998 OK 51, 968 P.2d 1201, we stated the following.

This Court has said that, unless expressly assumed, implied covenants of an oil and gas leases do not extend to lease assignments with reservation of overriding royalty interest. Kile v. Amerada Petroleum Corp., [1925 OK 1006] 247 P. 681 (1925). We said that unless the contract of assignment imposed rights and obligations on the party the same as that of lessor and lessee, such relationship would not be implied. We declined to apply an implied covenant to protect against drainage in favor of an overriding royalty interest owner. We said that to hold the fundamental provisions in leasing contracts to be implied in the contract of assignment would be to stretch the rule beyond legitimate bounds where there was no express agreement in the contract that could form the basis of relief for the breach of an implied obligation. We said that such owner was limited to the terms of the assignment itself and that where there was no express obligation to drill or produce, no covenant would be implied.

Id. 1998 OK 51, ¶11, 968 P.2d at 1204. In XAE, various implied covenants arising from an oil and gas lease did not apply to an overriding royalty interest "unless the contract of assignment imposed rights and obligations on the party the same as that of lessor and lessee." XAE concludes no implied covenants, including a covenant to produce, could be possessed by an overriding interest unless imposed by the contract of assignment.

¶62 Moore does not point to any language in (1) his assignment from Mustang Fuel Corporation for the creation of a obligation owed to Moore that would prevent a extinguishment by conduct of either working interest owners in the Ball #1-24 well or Oil Valley, or (2) any agreement creating an anti-washout right for Moore with respect to these working interest owners or Oil Valley.

¶63 Moore does not argue an implied anti-washout covenant arises from the Athan lease. However, his interpretation of the Athan lease during partial summary adjudication proceedings indicates a view that the habendum clause: (1) Gives the clause the effect of an anti-washout provision by making the Athan lease's release clause subservient to the habendum clause; or (2) Makes production satisfying the habendum clause sufficient to make a surrender of the lease a factual circumstance which necessarily results in fraud or a breach of a fiduciary duty, and that such is a wrongful extinguishment.

¶64 XAE also noted the following concerning the possessor of an overriding royalty interest which is lost or extinguished.

The nature of an overriding royalty interest is such that it attaches only when oil and gas are reduced to possession. Before this, the owner of an overriding royalty has no assertable right in the leasehold and the vesting of such owner's rights are dependent upon the happening of a future event or condition. De Mik v. Cargill, 1971 OK 61, 485 P.2d 229. In De Mik we held that an overriding royalty was lost upon renewal of the oil and gas lease because, absent fraud or breach of a fiduciary relationship, the interest did not continue and attach to subsequent leases secured in good faith by the lessee.

Id. 1998 OK 51, ¶24, 968 P.2d at 1207 (emphasis added). This language states an overriding royalty is lost or extinguished upon renewal of an oil and gas lease because "absent fraud or breach of a fiduciary relationship, the interest did not continue and attach to subsequent leases secured in good faith by the lessee." Id. Our explanation in XAE relied upon De Mik v. Cargill, 1971 OK 61, 485 P.2d 229, 58 A.L.R.3d 1042, where we stated the following.

[A]n overriding royalty may be lost entirely by expiration of the primary lease since, absent fraud or breach of fiduciary relationship, the interest does not continue and attach to a subsequent lease secured, in good faith, by the lessee. . . Neither does an overriding royalty survive cancellation, surrender, abandonment resulting from diminution of production beyond economic feasibility, nor total failure to secure production in paying quantities.

Id. 485 P.2d at 233 (emphasis added). This language in De Mik agrees with language we used in Thornburgh v. Cole, 1949 OK 167, 207 P.2d 1096, where we relied on the California Supreme Court in La Laguna Ranch Company v. Dodge, 18 Cal.2d 132, 114 P.2d 351, 135 A.L.R. 546 (1941), and explained an overriding royalty interest was lost or "extinguished" by the lessee surrendering the lease when quit-claiming to the lessor, unless extinguishing the override was prevented by the instrument that created the override. Thornburgh, 207 P.2d at 1100. We explained this extinguishment of the override occurred in La Laguna Ranch Company "because the agreement did not provide that the overriding royalty should apply to renewal, extension or modification of the lease." Id.

¶65 In summary, our opinions spanning several decades in XAE, De Mik, Thornburgh, and Kile explain an overriding royalty interest being lost or extinguished when the lessee's working interest that was used to carve out the override was itself lost or extinguished. These opinions indicate an overriding royalty extinguished by extinguishing its related working interest is not within the traditional class of constructive frauds when these frauds are defined by the nature and subject of the transaction itself.[58] Again, an exception to extinguishing an override was noted in XAE and earlier opinions when the "overriding royalty was lost" because of "fraud or breach of a fiduciary relationship." XAE, 1998 OK 51, ¶24, 968 P.2d at 1207.

¶66 Amicus curiae raises the issue of "constructive fraud" occurring with extinguishing an override, such as a lessee's release of a lease. We have explained a constructive fraud "is a breach of either a legal or equitable duty, [and] does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose ... [and] may be defined as any breach of a duty which, regardless of the actor's intent, gains an advantage for the actor by misleading another to his prejudice."[59] We have discussed a defendant's duty as a required element in a fraud claim,[60] and this definition of constructive fraud requires duty as an element: "a breach of a legal or equitable duty." Moore does not explain how this duty he seeks to impose on lessee could be consistent with our explanations that "the owner of an overriding royalty has no assertable right in the leasehold and the vesting of such owner's rights are dependent upon the happening of a future event or condition," and attaching "only when oil and gas are reduced to possession."

¶67 Amicus curiae challenges a lessee's release and asserts: "The owner of a lease does have certain obligations which the owner of overriding royalty may enforce. For example, the owner of the lease may not surrender a producing lease and thereby destroy the overriding royalty"[61] We explained in Krug v. Helmerich & Payne, Inc., 2013 OK 104, 320 P.2d 102, that our prior opinions could not support a general proposition that Oklahoma law recognizes a fiduciary duty between lessors and lessees in an oil and gas lease. Id. 2013 OK 104, n. 7, 320 P.3d at 109. The argument by amicus curiae appears to state the fact of production creates a duty by the lessee to not surrender the lease.

¶68 Oil Valley was not a lessor or lessee in the Athan lease. Amicus curiae makes a claim Staab breached a duty to Moore when Staab made the release. Then amicus curiae makes Oil Valley a part of duty being breached by both Waban and Staab by alleging Oil Valley conspired with Staab and Waban. Amicus curiae's argument is that allowing a release when a well is commercially profitable allows "a lessor [Waban] and partial lessee [Staab] to conspire (constructive fraud) to eliminate an outstanding recorded real property interest to the detriment of the title holder (the Deep Rights and an ORRI carved from the Base Lease) contrary to the terms of the Base Lease."[62]

¶69 Of course, constructive fraud is well-known and may arise in various contexts, including a real estate transaction when a party's conduct shows "unclean hands" in the transaction.[63] Any real estate transaction could potentially involve a constructive fraud based upon a party's conduct involving the breach of a legal or equitable duty. Similarly, a lessee's mere release or surrender of interest in an oil and gas lease is not intrinsically constructive fraud.

¶70 Amicus curiae's argument is based upon a fact not shown in the record on appeal. Amicus curiae seeks an adjudication and explanation of duties and obligations of lessors, lessees, and others acting with them when a lease is held by production in commercially paying quantities. We have explained the record in this appeal does not show the Ball #1-24 well was commercially profitable in paying quantities. Adjudicating whether Moore's override was improperly extinguished due to the presence of a fraud or a breach of a fiduciary relationship and based upon the fact of production in paying quantities when the record does not state whether this fact exists, would make our pronouncement an improper advisory opinion.[64]

¶71 Oil Valley's response to amicus curiae states allegations of "conspiracy and/or constructive fraud" were not "directly asserted" by Moore, but "Appellee [Moore] raised similar arguments with their [sic] causes of action for slander of title and tortious interference with a business relationship, however the trial court granted Appellant's motion for partial summary judgment with regard to these claims."[65] Oil Valley objects to amicus curiae raising and discussing constructive fraud.

¶72 Moore's answer to Oil Valley's petition alleges the latter had "unclean hands" and an allegation Oil Valley's claims were "precluded by principles of equity, equitable considerations and the abhorrence of forfeitures." Moore pleads legal conclusions of estoppel, quasi-estoppel, and judicial estoppel in answer to Oil Valley's petition. Moore also alleges Oil Valley's conduct was "misleading" and "maliciously seeking to have other working interest owners having an interest at shallower depths . . . release their interest(s) to the detriment of Moore;" and these claims are made as part of Count III, a slander of title counterclaim, and then incorporated by reference in Count IV, a tortious interference counterclaim.

¶73 Oil Valley's argument in an equitable proceeding is that Moore made specific allegations alleging improper behavior by Oil Valley in Moore's Answer in Count III, and then incorporated into Count IV; but Moore failed to incorporate them in earlier Count II, the quiet title counterclaim. Oil Valley's argument is similar to former practice when a bill in chancery was subject to attack because a fact was pled in one part of the bill and not another.[66] Statements in a pleading may be adopted by reference in a different part of the same pleading.[67] Instead of a more typical objection that an opposing party has incorporated too many allegations in a pleading,[68] Oil Valley argues Moore incorporated too few allegations in the proper part of the pleading for his quiet title claim.

¶74 We have stated: "The general philosophy of the Pleading Code is that pleadings should give fair notice of the claim."[69] Trial court procedure distinguishes facts for various types of judicial treatment based upon the method a party uses for judicial cognizance of the particular fact, e.g., in a pleading, in a list of disputed or non-disputed facts in a motion for summary judgment, and testimony. Oil Valley's issue is whether it received "fair notice" of Moore's quiet title claim based on "unclean hands" for the purpose of the scope of issues properly addressed by amicus curiae.

¶75 We agree an amicus curiae is not allowed to expand a record on appeal or the issues raised in the trial tribunal.[70] The terms "fraud" and "constructive fraud" do not appear as legal conclusions in Moore's answer to Oil Valley's petition.

¶76 Some courts have stated the basis for equitable estoppel may include fraud,[71] and some explain fraud is not necessarily required for an equitable estoppel to be applied.[72] In some courts, the term "fraud" may not expressly appear in the pleading as a conclusion, but if "the facts from which that conclusion necessarily follows" are alleged, then they are sufficient to raise an estoppel constituting a "fraud in some form that is essential" to the cause of action pled.[73] We have stated circumstances surrounding fraud must be pled with sufficient particularity to afford an opponent adequate notice to prepare a responsive pleading.[74]

¶77 Whether Moore properly pled circumstances of an estoppel or a constructive fraud was not addressed in the trial court, in part because of the unusual procedure used by both Moore and Oil Valley with each seeking an adjudication of a title in equity by a single alleged fact; and then seeking an appellate review whether a single fact was sufficient to create a title and cancel an oil and gas lease. For Oil Valley's argument, the alleged fact of a lessee's release, once proven, meant it should be awarded title. For Moore's argument, the alleged fact of continued production, once proven, meant he should be awarded title. We conclude that the arguments raised by amicus curiae do not impermissibly expand the scope of issues raised in this controversy by the parties.

¶78 The Athan lease provides in part the following: "Lessee may at any time and from time to time surrender this lease as to any part or parts of the leased premises by delivering or mailing a release thereof to lessor, or by placing a release of record in the proper County." We have explained a surrender or release of a lease in substantial compliance with the terms of the lease will be given effect.[75] We have also explained a lessee's interests in a lease may be extinguished with a surrender by delivery to a lessor or filing on the record in the proper county when allowed by the terms of the lease.[76]

¶79 Oil Valley argues in response to amicus curiae that: "Appellee has admitted within its own pleadings that the Top Lease became effective as to the shallow rights upon the execution of the release by Staab."[77] The document relied on by Oil Valley for this conclusion shows Moore repeating Oil Valley's claim as to the top-lease and responding that the top-lease did not take effect by the release. The parties did not specifically seek an adjudication whether "execution of the release" satisfied the lease language for a surrender. We need not make this first-instance adjudication in an appeal.[78]

¶80 Moore's focus on asserting production from the Ball # 1-24 well argues a release has no effect on his interests. He relies on Scurlock Oil Co. v. Getty Oil Co., 294 So.2d 810 (La.1974), and Marshall v. Beekay Co., 2015-Ohio-238, 27 N.E.3d 1 (4th Dist. 2015). Scurlock discussed the effect of a quitclaim in Louisiana and held an instrument in which a party did "release, relinquish and quit claim all of its rights" applied to the party's "retained rights" possessed at time of the release. Id. 294 So.2d at 820. In Marshall the court held that when a lease grants rights to all depths without distinction, then an assignment of shallow rights did not "sever the leasehold," and shallow production in paying qualities from a shallow-depth well held the entire lease, including the deep rights. Id. 27 N.E.3d 8-9. Neither of these opinions support Moore's argument. They are not persuasive on the issues before us to adjudicate.

¶81 Several arguments are made concerning Moore's obligations and rights based upon his status as a lessee of the deep strata rights pursuant to the Athan lease. For example, on certiorari, Oil Valley argues "Moore took no action whatsoever to develop his interest in the Deep Rights . . . during the approximately twenty-five years he owned said rights." Further, that even after Staab recorded the release on March 5, 2018, "Moore took no action under the sixty (60) day Cessation of Production Clause to engage in operations for drilling or reworking of a well." Oil Valley also alleges Moore, as a lessee, breached implied covenants. Moore states these arguments are of a type to be raised by a lessor to a lease, and not Oil Valley as a stranger to the Athan lease.[79] Oil Valley does not address when a stranger to the base lease, but a lessee to a top-lease, may raise duties and obligations of parties to the base lease in a quiet title proceeding.

¶82 Oil Valley's argument is based upon Ball #1-24 well having ceased to produce in commercially paying quantities. Both Oil Valley and Moore agree that the Ball #1-24 well held the Athan lease when it was producing in commercially paying quantities. However, Oil Valley argues after the release was filed (or executed) any production from the Ball #1-24 well should be attributed to Oil Valley pursuant to the top-lease, because no lessee "pursuant to the Athan lease" was producing from the well. Continued production from the Ball #1-24 well was one fact Moore desired to use to show the unclean hands of Oil Valley for the purpose of challenging the release and top-lease in equity. This alleged fact has not been adjudicated by the District Court.

¶83 We conclude the trial court record is insufficient for adjudicating the issues concerning Moore's rights and duties as a lessee in the base lease on Moore's claim in equity that Oil Valley had unclean hands. Additionally, nothing in the record suggests the trial court actually decided these issues as part of its quiet title adjudication. We do not analyze Moore's rights and obligations as a lessee in the Athan lease for the purpose of competing quiet title claims brought by the parties.

VI. Attorney Fees and Costs

¶84 Oil Valley filed an application for attorney fees and costs and relied on 12 O.S. § 696.4; §978; and §1141.5. Moore responded and argued Oil Valley failed to file with the Clerk of the Supreme Court a verified statement of taxable cost items showing that a person has paid the same as required by Okla. Sup. Ct. R. 1.14(A)(1). Moore also argued Oil Valley failed to show compliance with the Nonjudicial Marketable Title Procedures Act, (NMTPA), 12 O.S.2011 § 1141.1 - 1141.5.

¶85 Oklahoma Supreme Court Rule 1.14(A)(1) states the applicant "shall file with the Clerk a verified statement of taxable cost items showing that person has paid the same." We need not discuss costs authorized by 12 O.S.2021 § 978. A verified statement was not filed, and the application for costs of appeal is denied.

¶86 A motion for attorney fees for services performed on appeal shall be made to the appellate court by separate motion filed any time before issuance of mandate. 12 O.S.Supp.2012 §696.4(C). A motion shall cite authority for awarding attorney fees but shall not include evidentiary material concerning the amount of the attorney fees. Id.

¶87 Oil Valley relies upon the Nonjudicial Marketable Title Procedures Act, (NMTPA), 12 O.S.2011 § 1141.1 - 1141.5, specifically section 1141.5, for an attorney's fee as a prevailing party. In Stump v. Cheek, 2007 OK 97, 179 P.3d 606, we declined to make first instance determinations on disputed questions of fact or law, and remanded to the trial court for further proceedings on whether the party complied with the provisions of the NMTPA. We also decline to make first instance determination of facts and conclusions of law concerning Oil Valley's compliance with the NMTPA. The reversal herein with a remand returns the matter to the trial court without a prevailing party on the parties' opposing claims in equity.[80]

¶88 In GRP of Texas, Inc. v. Eateries, Inc., 2001 OK 53, 27 P.3d 95, we awarded a conditional attorney fee based upon a party ultimately prevailing on a cause of action in the trial court on remand. However, in 2004 the Legislature amended 12 O.S.Supp.2002, §686.4 by adding paragraph "(D)" which now provides as follows.

If the right of a party to recover attorney fees depends upon a determination that the party has prevailed in an action, and if the prevailing party in the action cannot be determined from the decision of the appellate court, an application for attorney fees for services performed on appeal shall be made to the trial court in the manner and within the time provided in subsection B of this section.

12 O.S.2021 §696.4(D). Application for an attorney fee based upon prevailing party status is adjudicated in the District Court when a prevailing party is determined in that court. 12 O.S.2021 § 696.4(B) & (D).

VII. Conclusion

¶89 Exhibits presented during partial summary adjudication proceedings by Moore were insufficient to show the Ball #1-24 well was commercially profitable and producing in paying quantities. The parties disputed whether the well was producing in paying quantities. Whether the well was producing in paying quantities was a material fact for an element of Moore's equitable claim against Oil Valley based on the habendum clause.

¶90 Oil Valley argued whether the well was profitable did not matter, and Moore had no claim in equity because Oil Valley had a lessee's surrender or release of interest in the well. Moore's claim was not limited to whether the well was commercially profitable in paying quantities. Moore alleged Oil Valley had unclean hands when obtaining the top-lease and the release. An overriding royalty interest may be extinguished by an extinguishment of the working interest from which the override was carved by lessee's surrender in substantial compliance with the lease, unless the surrender is the result of fraud or breach of a fiduciary relationship. Moore and amicus curiae appear to argue a "washout" necessarily falls within the well-known "fraud or breach of fiduciary relationship" exception to extinguishing an overriding royalty interest when a well has commercially profitable production at the time a lessee surrenders a lease. The trial court has not been presented facts necessary to determine whether the Ball #1-24 well was profitable at the time of Staab's release. Moore's claim in equity based upon allegations of unclean hands against Oil Valley has not been determined by the trial court.

¶91 This Court will not make a first instance adjudication of rights and obligations of parties to a lease and top-lease when the facts were not developed in a trial court equitable proceeding brought to adjudicate those rights and obligations based upon all of the circumstances.

¶92 The opinion of the Court of Civil Appeals is vacated. Prevailing party status for the purpose of an attorney fee is determined in the trial court. We reverse the order granting Moore a partial summary adjudication and remand for additional proceedings consistent with this opinion.

¶93 CONCUR: KANE, C.J.; ROWE, V.C.J.; KAUGER, WINCHESTER, EDMONDSON, GURICH, DARBY, and KUEHN, JJ.

¶94 NOT PARTICIPATING: COMBS, J.

FOOTNOTES

[1] Each party sought adjudication based upon affirming and attacking oil and gas leases. The burden of proof to present facts and argument for a cause of action seeking cancellation of an oil and gas lease rests upon the party seeking to cancel the lease. Magnolia Petroleum Co. v. St. Louis-San Francisco Ry. Co., 1944 OK 280, 152 P.2d 367 (Court Syllabus). This burden includes showing all facts and circumstances material to the cause of action and relief sought. Stewart v. Amerada Hess Corp., 1979 OK 145, 604 P.2d 854, 858 (cancelling a lease may be based upon absence of production in paying quantities when there are no compelling equitable considerations to justify continuation of production from an unprofitable well operation); Pack v. Santa Fe Minerals, 1994 OK 23, ¶30, 869 P.2d 323 (lessors seeking to cancel oil and gas leases failed to meet their burden); Barby v. Singer, 1982 OK 49, 648 P.2d 14, 16-17 ("all of the facts and circumstances of each case" must be considered); Durkee v. Hazan, 1968 OK 96, 452 P.2d 803, 814 (viability of a lease "must be viewed in the light of all the circumstances" in a quiet title controversy).

[2] In re Guardianship of Berry, 2014 OK 56, ¶40, 335 P.3d 779, 792-93 ("intermediate or interlocutory orders anterior to judgment may be reviewed on appeal from the judgment") (emphasis omitted).

[3] ROA, Defendant Clay E. Moore's Motion for Summary Judgment and Brief in Support, Exhibit "H" (April 26, 2019).

[4] ROA, Defendant Clay E. Moore's Motion for Summary Judgment and Brief in Support, Exhibit "I" with its attached exhibit "A" (April 26, 2019).

[5] We use terms such as "shallow," "deep[er]," and "strata" without repeating the name of the Ball #1-24 well and its depth for a simpler description in our analysis distinguishing (1) a depth assignment including the Ball #1-24 well, and (2) a depth assignment for a deeper depth or strata. See, e.g., Lewis G. Mosburg, Jr., Ownership and Transfer of Title to Oil and Gas, Handbook on Petroleum Land Titles (1976), printed in, Eugene Kuntz, Oklahoma Law of Oil & Gas, 107 (1983) (commenting a division as to depth in an assignment is common, and advising that an assignment naming or distinguishing a particular formation or strata may be insufficient and specifying a particular well at a specific depth is favored).

[6] ROA, Defendant Clay E. Moore's Motion for Summary Judgment and Brief in Support, General Statement of Undisputed Facts, No. 33 (April 26, 2019).

[7] ROA, Defendant Clay E. Moore's Motion for Summary Judgment and Brief in Support, Exhibit "O" (April 26, 2019).

[8] Voiles v. Santa Fe Minerals, Inc., 1996 OK 13, ¶11, 911 P.2d 1205, 1209 ("A top lease is where the lease taken is subject to a pre-existing lease that has not expired when the second lease was taken."); French Energy, Inc. v. Alexander, 1991 OK 106, n.15, 818 P.2d 1234, 1238 (same).

[9] ROA, Defendant Clay E. Moore's Motion for Summary Judgment and Brief in Support, 3 (April 26, 2019).

[10] ROA, Plaintiff Oil Valley Petroleum LLC'S Combined Response to Defendant Clay E. Moore's Motion for Summary Judgment and Counter Motion for Summary Judgment Against Clay E. Moore and Brief in Support, 2 (May 24, 2019).

[11] Id., at 3.

[12] ROA, Defendant Clay E. Moore's Reply and Response to Plaintiff Oil Valley's Response and Counter-Motion for Motion for Summary Judgment and Brief in Support, 3 (June 14, 2019).

[13] Id., at 4.

[14] Colonial Royalties Co. v. Keener, 1953 OK 385, 266 P.2d 467, 472. An owner of a working interest may have limited that "right to work" by an operating agreement. Howard R. Williams and Charles J. Meyers, Manual of Oil and Gas Terms, 472 (5th ed. 1981) (a "non-operating working interest" is "the working interest or fraction thereof in a tract the owner of which is without operating rights by reason of an operating agreement.").

[15] Hinds v. Philips Petroleum Co., 1979 OK 22, 591 P.32d 697, 698; see also Mohoma Oil Co. v. Ambassador Oil Corp., 1970 OK 161, 474 P.2d 950, 960 ("An oil and gas lease is a chattel real, an incorporal hereditament, and a profit a pendre, which grants only the exclusive right, subject to legislative control, to explore by drilling operations, to reduce to possession, and thus acquire title to the oil and gas which is personalty.").

[16] See, e.g., Indian Territory Illuminating Oil Co. v. Killingsworth, 1935 OK 937, 51 P.2d 505, 507 (discussing obligations and privity of estate with lessor, lessee, and assigns, and privity of contract); McCall v. Chesapeake Energy Corp., 2007 OK CIV APP 59, 164 P.3d 1120 (approved for publication by the Supreme Court), (a right/duty of a non-operating working interest owner adjudicated based upon a joint operating agreement).

[17] Moore's Reply on summary judgment at 6.

[18] Scurlock Oil Co. v. Getty Oil Co., 294 So.2d 810 (La.1974); Marshall v. Beekay Co., 2015-Ohio-238, 27 N.E.3d 1 (4th Dist. 2015).

[19] Ridge Oil Co. v. Guinn Investments, Inc., 148 S.W.3d 143 (Tex.2004); Sasser v. Dantex Oil & Gas, Inc., 906 S.W.2d 599, 604 (Tex. App.--San Antonio 1995, writ denied).

[20] Progressive Direct Ins. Co. v. Pope, 2022 OK 4, ¶14, 507 P.3d 688, 693.

[21] Western Heights Indep. Sch. Dist. No. I-41 of Okla. County v. State ex rel. Okla. Dep't of Educ., 2022 OK 79, n.22, ¶21, 518 P.3d 531, 540-41.

[22] Tres C, LLC v. Raker Resources, LLC, 2023 OK 13, ¶22, 532 P.3d 1, 14.

[23] Progressive Direct Ins. Co. v. Pope, 2022 OK 4, ¶19, 507 P.3d 688, 694-95 (meanings assigned by trial court to terms in an insurance contract based upon trial court's conclusions of law will receive de novo appellate review).

[24] Progressive Direct Ins. Co. v. Pope, supra note 23; Widner v. Enerlex, Inc., 2013 OK 91, ¶¶2, 9, 313 P.3d 930, 931, 933 (summary judgment was granted in an equitable proceeding and issues of law decided by trial court received de novo appellate review).

[25] Reeds v. Walker, 2006 OK 43, ¶32, 157 P.3d 100, 116; see also Spirgis v. Circle K Stores, Inc., 1987 OK CIV APP 45, ¶ 10, 743 P.2d 682, 685 (approved for publication by Supreme Court).

[26] Reeds v. Walker, 2006 OK 43, ¶32, 157 P.3d 100, 116.

[27] Oklahoma Pub. Employees Ass'n v. Oklahoma Dep't of Cent. Servs., 2002 OK 71, ¶6, 55 P.3d 1072, 1076.

[28] Indep. Sch. Dist. No. 52 of Okla. Cty. v. Hofmeister, 2020 OK 56, ¶28, 473 P.3d 475, 489.

[29] Shawareb v. SSM Health Care of Okla., Inc., 2020 OK 92, n.16, 480 P.3d 894, 900.

[30] Kincaid v. Black Angus Motel, Inc., 1999 OK 54, ¶21, 983 P.2d 1016, 1022 (quoting Hadnot v. Shaw, 1992 OK 21, 826 P.2d 978, 985).

[31] See, e.g., Miller v. Miller, 1998 OK 24, ¶15, 956 P.2d 887, 894 (The question of the existence of elements necessary to a particular cause action in a controversy presents a question of law reviewed de novo on appeal; and was presented for trial court adjudication by a motion to dismiss for failure to state a claim upon which relief could be granted.).

[32] Claude C. Arnold Non-Operated Royalty Interest Props., L.L.C. v. Cabot Oil & Gas Corp., 2021 OK 4, ¶17, 485 P.3d 817, 822 (an oil and gas lease is a contract to be construed like any other agreement).

[33] Pitco Prod. Co. v. Chaparral Energy, Inc., 2003 OK 5, ¶ 14, 63 P.3d 541, 545--46.

[34] Mercury Inv. Co. v. F.W. Woolworth Co., 1985 OK 38, 706 P.2d 523, 529; Pitco Prod. v. Chaparral Energy, supra n.33.

[35] In re Vose, 2017 OK 3, ¶ 28, 390 P.3d 238, 249 ("extant applicable law is a part of every contract in this state as if it were expressly cited or its terms incorporated in the contract").

[36] Rist v. Westhoma Oil Co., 1963 OK 126, 385 P.2d 791, 794, 796.

[37] Myers v. Missouri Pacific R. Co., 2002 OK 60, ¶¶ 39-41, 52 P.3d 1014, 1034-35.

[38] Baytide Petroleum, Inc. v. Continental Resources, 2010 OK 6, n.6, 231 P.3d 1144 (explaining a base lease); Williams and Meyers, Manual of Oil and Gas Terms, supra n. 14, at 70 (bottom lease is the existing lease covering a mineral interest upon which a second lease or top-lease has been granted).

[39] Turben v. Douglas, 1919 OK 145, 183 P. 881, 886 (when an assignment was made of an oil and gas lease after commencement of a district court proceeding adjudicating ownership of the assigned lease and other leases, the Court noted the assignee acquired no greater rights by the assignment than those rights possessed by the assignor).

[40] Fox v. Thoreson, 398 S.W.2d 88, 91 (Tex. 1966) (material omitted); see also Winn v. Nelson, 1983 OK 91, 670 P.2d 588 (lease executed on February 17, 1977, with a primary term of five years in a commencement-type lease, authorized operator's commencement of operations on February 16, 1982); Buckles v. Wil-McOil Corp., 1978 OK 137, 585 P.2d 1360, 1362-63 (discussed primary term, a provision of a lease, and the applicable law that is a part of a contract when executed) Williams and Meyers, Manual of Oil and Gas Terms, supra n. 14, 570-71 (primary term) (relying on Fox v. Thoreson, supra).

[41] Hall v. Glamor, 2018 OK 59, n. 59, 427 P.3d at 1063.

[42] Id., 2018 OK 39, n.106 & ¶51, 427 P.3d 1052, 1071-72 (noting opinions predating the statutory amendment, and quoting Wickham v. Gulf Oil Corp., 1981 OK 8, 623 P.2d 613, 616, and its explanation of the 1977 statutory amendment).

[43] Owens v. Owens, 2023 OK 12, n.12, ¶36, 529 P.3d 905, 916 (opposing parties may agree on the judicial disposition of their claims provided public policy is not contravened); McDonald v. Amtel, Inc., 1981 OK 78, ¶9, 633 P.2d 743, 745 (parties may agree to contractual provision unless prohibited by law); Oklahoma Schools Risk Management Trust v. McAlester Public Schools, 2019 OK 3, ¶14, 457 P.3d 997, 1001 (argument addressed on appeal is usually based on both the substance of the argument as shaped by the parties and the substance of the trial court's adjudication).

[44] Hall v. Galmor, supra note 41, at ¶36, 427 P.3d at 1067-68.

[45] O'Neill v. American Quasar Petroleum Co., 1980 OK 2, 617 P.2d 181, 184.

[46] XAE Corp. v. SMR Property Management Co., 1998 OK 51, ¶23, 968 P.2d 1201, 1206 (quoting Thornburgh v. Cole, 1949 OK 167, 207 P.2d 1096, 1098); see also Claude C. Arnold Non-Operated Royalty Interest Props., L.L.C. v. Cabot Oil & Gas Corp., supra n. 32, at n. 2, 485 P.3d at 819 (citing De Mik v. Cargill, 1971 OK 61, 485 P.2d 229, 232); Walden v. Potts, 1944 OK 299, 152 P.2d 923 (Syllabus by the Court) (paying quantities means not only discovery but taking out oil or gas in pursuance of the covenants and purposes of the lease in such quantities as will pay a profit to the lessee over the operating expenses).

[47] See, e.g., XAE Corp. v. SMR Property Management Co., supra n.46, at ¶31, 968 P.2d at 1208 ("Because the overriding royalty interest in the case at bar is an in-kind interest deliverable at the wellhead, the costs thereafter were properly deducted before the royalty was paid.").

[48] Hall v. Galmor, supra n.41, at ¶21, 427 P.3d at 1063.

[49] Bixler v. Lamar Exploration Co., 1987 OK 15, 733 P.2d 410, 412 ("[T]he issue of the capability of appellee's well to produce in paying quantities is material to the resolution of this case ... this action is reversed and remanded for a determination of whether the well is capable of production in paying quantities.").

[50] ROA, Plaintiff Oil Valley Petroleum LLC's Combined Response...and Counter Motion for Summary Judgment, 5 (May 24, 2019) (portion of title omitted).

[51] Williams and Meyers, Manual of Oil and Gas Terms, supra n.14, 817 (A "washout" is an "[e]limination of an overriding royalty or other share of the working interest by the surrender of a lease by a sublessee or assignee and subsequent reacquistion of a lease on the same land free of such interest.") (relying in part on Berman v. Brown, 224 La. 619, 70 So.2d 433 (1954) and Sunac Petroleum Corp. v. Parkes, 416 S.W.2d 798, 804 (Tex. 1967)). The term "washout" is used in various contexts in the oil and gas industry. See, e.g., ANR Prod. Co. v. Westburne Drilling, Inc., 581 F.Supp. 542, n.1, 1545 (D.Colo.1984) (A "washout" may also refer to "[a] hole in a drill pipe or tool joint."').

[52] Sawyer v. Guthrie, 215 F.Supp.2d 1254, n.2, 1258 (D. Wyo. 2002).

[53] Brandon Durrett, Turn Around, Don't Drown: A New Generation of Oil and Gas "Washouts" in Texas and How to Avoid Them, 53 Tex. Tech. L. Rev. 473, 474 (2021).

[54] See, e.g., Lewis G. Mosburg, Jr., Contracts Used in Oil and Gas Operations, 194-196, 222-223 (1981) (American Ass'n of Petroleum Landmen, Model Form Operating Agreement, Form, 610, 1956 (Non-Federal Lands) (revised in part, 1967) and Form 610-1977 (revised 1977) (a preferential right of purchase if any party to the agreement desires to surrender or sell its interest, and a right to participate in renewal or extension of leases if any party secures a participation right); John R. Reeves, Changes to the A.A.P.L. Form 610 Model Form Operating Agreement, printed in Mosburg, supra, 128-173, 152-153 (history of Form 610, 1977 changes to Form 610, and explaining a well which has produced may not to be plugged and abandoned without the consent of all parties and distinguished rights based upon whether a party had been "fully reimbursed," and also advising parties may need to add a provision for when parties have not been fully reimbursed and a producing well becomes a "non-commercial well" ); cf. Mosburg, supra, 75-104, Conventional Farmout Agreement with Operating Agreement, Exhibit "D" Assignment (a reassignment to assignor if an assignee "should elect to surrender, abandon or release all or any part of its rights in said lease acreage").

[55] Otter Oil Co. v. Exxon Co., 834 F.2d 531, 533 (5th Cir. 1987)("The purpose of the extension-and-renewal clause is to prevent a 'washout,'" and protect the overriding royalty); EOG Resources, Inc. v. Hanson Production Co., 94 S.W.3d 697, 703 (Tex. App.-San Antonio 2002, no pet.) ("An overriding interest created by assignment does not survive the termination of the assigned lease unless the instrument creating the overriding interest provides an express provision to the contrary."); cf. Robinson v. North American Royalties, Inc., 463 So. 2d 1384 (La. Ct. ApP.3d Cir. 1985) (An "extension clause" is "commonly referred to as an anti-washout provision" and provides the overriding royalty interest will also apply to any new mineral leases.); 5 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 63.2, at 229 (1991) (noting an "instrument by which the interest is created may provide that the overriding royalty will apply to modifications, renewals, and extensions of the lease").

[56] SM Energy Co. v. Sutton, 376 S.W.3d 787, 791 (Tex. App. -- San Antonio 2012, pet. denied) ("It was the ORRIs' owners' burden to include an express provision to save their ORRIs from being extinguished by a partial termination that the lease expressly contemplated."); cf. Apache Deepwater, LLC v. McDaniel Partners, Ltd., 485 S.W.3d 900, 905 (Tex. 2016) ("Thus, in the case of a single lease, an overriding royalty ... will not survive termination of the leasehold it burdens unless the parties have expressly agreed otherwise.").

[57] See, e.g., Lillibridge v. Mesa Petroleum Co., 907 F.2d 1031, 1035-36 (10th Cir. 1990) (applying Kansas law and discussing interests of the parties, concluding a new lease did not involve a confidential relationship, and explaining "the relief the court [in Kansas] extended to holders of royalty interests under terminated leases was plainly limited to cases involving fraud or collusion") (explaining Campbell v. Nako Corp., 195 Kan. 66, 402 P.2d 771 (1965) (explanatory phrase added)).

[58] See, e.g., 2 Pomeroy's Equity Jurisprudence, § 924 (1905) ("Constructive Fraud Apparent from the Intrinsic Nature and Subject of the Transaction Itself--This class includes three principal subjects: 1. Inadequacy of consideration; 2. Contracts illegal because opposed to statute, or to public policy, or to good morals; and 3. Certain transactions which, in analogy with contracts, equity regards as contrary to public policy, an therefore illegal.").

[59] Patel v. OMH Medical Center, Inc., 1999 OK 33, ¶ 34, 987 P.2d 1185, 1199; see also 15 O.S.2011 § 59: "Constructive fraud consists: 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or, 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud."

[60] See, e.g., ENI Producing Props. Program Ltd. P'ship 1982--I, etc. v. Samson Inv. Co., 1991 OK 21, ¶18, 977 P.2d 1086, 1089 (fraud claim premised on a failure to inform must be established on a duty to inform) (citing Silk v. Phillips Petroleum Co., 1988 OK 93, 760 P.2d 174, 179).

[61] Amicus Curiae Brief in Support of Appellee's Petition for Certiorari, 4 (March 10, 2022) (quoting Kuntz, Law of Oil and Gas § 55.3.).

[62] Amicus Curiae Brief, at 3 (explanation added).

[63] See, e.g., Bank of Meno v. Coulter, 1923 OK 1144, 221 P. 495, 497 (discussing principles in equity and stating the party who purchases with full notice of the equitable claim of another to the same property will not be permitted to be protected against that claim, but the purchaser's title will be postponed and made subservient to it based upon the concept of a constructive fraud); Henry E. Smith, Equity as Meta-Law, 130 Yale L.J. 1050, 1076 (2021) ("[E]quity has always had a special role in combatting opportunism... this went under the banner of 'constructive fraud'-- activities that might not technically be fraud but that carried a danger of the same kind of harm... [including] ... unconscionability, denials of injunctions, [and] unclean hands.") (material omitted).

[64] Tulsa Cty. Budget Bd. v. Tulsa Cty. Excise Bd., 2003 OK 103, n.31, 81 P.3d 662, 672 (Court does not issue advisory opinions).

[65] Appellant's Response to Amicus Curiae Brief in Support of Appellee's Petition for Certiorari, unnumbered pg. 2-3. (March 25, 2022).

[66] See, e.g., Henry L. McClintock, Handbook on the Principles of Equity, (2d ed. 1948) ("It was the general rule that allegations contained in the other parts of the bill could not cure the failure to allege some fact essential to plaintiff's success in the stating part of the bill.").

[67] Gaylord Entertainment Co. v. Thompson, 1998 OK 30, n.10, 958 P.2d 128, 136; 12 O.S.2011 §2010(C). Additionally, 12 O.S.2011 § 2010(B) provides in part: "All averments of claim or defense shall be made in numbered paragraphs,...and a paragraph may be referred to by number in all succeeding pleadings."

[68] In some federal courts, a pleading that incorporates every antecedent allegation of fact for every subsequent claim for relief in the pleading without respect to whether allegations are appropriate or unnecessarily repetitive is sometimes described as one of the characteristics of the discredited "proverbial shotgun pleading." Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1279 (11th Cir. 2006); In re Smith, 489 B.R. 875, 891 (Bankr. M.D.Ga. 2013).

[69] Wilson v. Webb, 2009 OK 56, ¶9, 221 P.3d 730, 734; cf. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (Fed. R. Civ. Pro. 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'").

[70] Torres v. Seaboard Foods, LLC, 2016 OK 20, n.2, 373 P.3d 1057, 1063 (amicus curiae may not expand the record on appeal); City of Okla. City v. State ex rel. Okla. Dept of Labor, 1995 OK 107, n.4, 918 P.2d 26, 32 (supplemental opinion on rehearing) (amicus curiae's participation is confined to the issues raised by the parties).

[71] See, e.g., Farrington v. Allsop, 670 N.E.2d 106 (Ind.Ct.App.1996), (holding constructive fraud might give rise to an equitable estoppel, and stating "The basis for the doctrine of equitable estoppel is fraud, either actual or constructive, on the part of the person estopped.'") (quoting Lawshe v. Glen Park Lumber Co., 176 Ind.App. 344, 375 N.E.2d 275, 278 (1978); In re Cancellation of Stabio Ditch Water Right on Spearfish Creek, 417 N.W.2d 391 (S.D. 1987) ("The essential element of equitable estoppel is fraud.").

[72] See, e.g., Maness v. K&A Enterprises of Mississippi, LLC, 250 So. 3d 402, 412 (Miss. 2018) ("fraud is not required for equitable estoppel to be applied") (citing PMZ Oil Co. v. Lucroy, 449 So.2d 201, 207 (Miss. 1984) (while a fraudulent intent to deceive may give rise to an estoppel, a substantial inequity may arise justifying an estoppel without an original subjective intent to deceive); cf. 2 Pomeroy's Equity Jurisprudence, supra n. 58 at § 803 (the essence of equitable estoppel is not the same as fraud, but "[i]t is accurate, therefore, to describe equitable estoppel, in general terms, as such conduct by a party that it would be fraudulent, or a fraud upon the rights of another, for him afterwards to repudiate and to set up claims inconsistent with it.").

[73] Notten v. Mensing, 3 Cal.2d 469, 45 P.2d 198, 202 (1935).

[74] A--Plus Janitorial & Carpet Cleaning v. Employers' Workers' Comp. Ass'n, 1997 OK 37, 936 P.2d 916, 930-31 Resolution Trust Corp. v. Greer, 1995 OK 126, n.43, 911 P.2d 257, 265; 12 O.S.2021 § 2009(B).

[75] McKee v. Grimm, 1925 OK 425, 238 P. 835 (surrender of lease in substantial compliance with a provision in a lease will be given effect) (Syllabus by the Court).

[76] Plains Petroleum Corp. v. Fine, 1935 OK 825, 51 P.2d 284, 286 (oil and gas lease provided a "Lessee may at any time surrender this lease by delivery or mailing a release thereof to the lessor, or by placing a release thereof on record in the proper county.").

[77] Appellant's Response to Amicus Curiae Brief In Support of Appellee's Petition for Certiorari, n.3, unnumbered pg. 2 (March 25, 2022) (citing "Defendant Clay E. Moore's Reply and Response to Plaintiff Oil Valley's Response and Counter-Motion for Summary Judgment and Brief in Support at pgs. 4-6.").

[78] Western Heights Indep. Sch. Dist. No. I-41 of Okla. County v. State ex rel. Okla. Dep't of Educ., supra n.21, at ¶23, 518 P.3d at 541 (Court does not make first-instance determinations of disputed issues of either law or fact in the exercise of its appellate jurisdiction.).

[79] See, e.g., Hall v. Galmor, supra n. 41, at ¶40, 427 P.3d at 1069 (discussing James Energy Co. v. HCG Energy Corp., 1992 OK 117, 847 P.2d 333, and its statement "the lessor must demand that an implied covenant be complied with before a court of equity will grant a forfeiture").

[80] Smedsrud v. Powell, 2002 OK 87, ¶13, 61 P.3d 891, 896 (on a judgment's reversal and a cause remanded, it returns to the trial court as if the judgment had never been decided, save only for the settled law of the case); Parker v. Elam, 1992 OK 32, 829 P.2d 677, 682 ("On remand from a reversed judgment, the parties are entitled to introduce additional evidence, supplement the pleadings, and expand the issues, unless specifically limited by the proceedings in error.").

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
1987 OK CIV APP 45, 743 P.2d 682, 58 OBJ 1702, 
Spirgis v. Circle K Stores, Inc.
Discussed

 
1989 OK CIV APP 3, 768 P.2d 383, 
Martens v. Kaiser-Francis Oil Co.
Discussed

 
2007 OK CIV APP 59, 164 P.3d 1120, 
MCCALL v. CHESAPEAKE ENERGY CORP.
Discussed

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1987 OK 15, 733 P.2d 410, 
Bixler v. Lamar Exploration Co.
Discussed

 
1988 OK 93, 760 P.2d 174, 59 OBJ 1688, 
Silk v. Phillips Petroleum Co.
Discussed

 
1991 OK 21, 807 P.2d 251, 62 OBJ 797, 
Unit Petroleum Co. v. Nuex Corp.
Cited

 
1991 OK 106, 818 P.2d 1234, 62 OBJ 3095, 
French Energy, Inc. v. Alexander
Discussed

 
1992 OK 21, 826 P.2d 978, 63 OBJ 442, 
Hadnot v. Shaw
Discussed

 
1992 OK 32, 829 P.2d 677, 63 OBJ 696, 
Parker v. Elam
Discussed

 
1992 OK 117, 847 P.2d 333, 63 OBJ 2303, 
James Energy Co. v. HCG Energy Corp.
Discussed

 
1994 OK 23, 869 P.2d 323, 65 OBJ 803, 
Pack v. Santa Fe Minerals
Discussed at Length

 
1997 OK 37, 936 P.2d 916, 68 OBJ 1266, 
A-Plus Janitorial & Carpet Cleaning v. Employers' Workers' Compensation Assoc.
Discussed

 
2001 OK 53, 27 P.3d 95, 72 OBJ 1938, 
GRP OF TEXAS, INC v. EATERIES, INC.
Discussed

 
1953 OK 385, 266 P.2d 467, 
COLONIAL ROYALTIES CO. v. KEENER
Discussed

 
1957 OK 174, 315 P.2d 758, 
REES v. BRISCOE
Discussed

 
1919 OK 145, 183 P. 881, 76 Okla. 78, 
TURBEN et al. v. DOUGLASS et al.
Discussed

 
1935 OK 825, 51 P.2d 284, 174 Okla. 570, 
PLAINS PETROLEUM CORP. v. FINE
Discussed

 
1935 OK 937, 51 P.2d 505, 175 Okla. 78, 
INDIAN TERR. ILLUMINATING OIL CO. v. KILLINGSWORTH
Discussed

 
1963 OK 126, 385 P.2d 791, 
RIST v. WESTHOMA OIL COMPANY
Discussed at Length

 
2002 OK 60, 52 P.3d 1014, 
MYERS v. MISSOURI PACIFIC RAILROAD CO.
Discussed

 
1923 OK 1144, 221 P. 495, 94 Okla. 213, 
BANK OF MENO v. COULTER
Discussed

 
2002 OK 71, 55 P.3d 1072, 
OKLAHOMA PUBLIC EMPLOYEES ASSOCIATION v. OKLAHOMA DEPT. OF CENTRAL SERVICES
Discussed

 
1968 OK 96, 452 P.2d 803, 
DURKEE v. HAZAN
Discussed

 
1970 OK 161, 474 P.2d 950, 
MOHOMA OIL CO. v. AMBASSADOR OIL CORP.
Discussed

 
1971 OK 61, 485 P.2d 229, 
DE MIK v. CARGILL
Discussed at Length

 
1995 OK 107, 918 P.2d 26, 66 OBJ 3184, 
City of Oklahoma City v. State ex rel. Oklahoma Dept. of Labor
Discussed

 
1995 OK 126, 911 P.2d 257, 66 OBJ 3566, 
Resolution Trust Corp. v. Greer
Discussed

 
2002 OK 87, 61 P.3d 891, 
SMEDSRUD v. POWELL
Discussed

 
2003 OK 5, 63 P.3d 541, 
PITCO PRODUCTION COMPANY v. CHAPARRAL ENERGY, INC.
Discussed

 
2003 OK 103, 81 P.3d 662, 
TULSA COUNTY BUDGET BOARD v. TULSA COUNTY EXCISE BOARD
Discussed

 
1996 OK 13, 911 P.2d 1205, 67 OBJ 529, 
Voiles v. Santa Fe Minerals, Inc.
Discussed

 
2006 OK 43, 157 P.3d 100, 
REEDS v. WALKER
Discussed at Length

 
2007 OK 97, 179 P.3d 606, 
STUMP v. CHEEK
Discussed

 
2009 OK 56, 212 P.3d 731, 
WILSON v. WEBB
Cited

 
2010 OK 6, 231 P.3d 1144, 
BAYTIDE PETROLEUM, INC. v. CONTINENTAL RESOURCES, INC.
Discussed

 
1980 OK 1, 606 P.2d 560, 
Hoyt v. Continental Oil Co.
Discussed

 
1980 OK 2, 617 P.2d 181, 
O'Neill v. American Quasar Petroleum Co.
Discussed

 
2013 OK 91, 313 P.3d 930, 
WIDNER v. ENERLEX, INC.
Discussed

 
2013 OK 104, 320 P.3d 1012, 
KRUG v. HELMERICH & PAYNE, INC.
Discussed

 
2014 OK 56, 335 P.3d 779, 
IN THE MATTER OF THE GUARDIANSHIP OF BERRY
Discussed

 
2016 OK 20, 373 P.3d 1057, 
TORRES v. SEABOARD FOODS, LLC
Discussed

 
1978 OK 137, 585 P.2d 1360, 
BUCKLES v. WIL-MC OIL CORP.
Discussed

 
1979 OK 22, 591 P.2d 697, 
HINDS v. PHILLIPS PETROLEUM CO.
Cited

 
2017 OK 3, 390 P.3d 238, 
IN THE MATTER OF THE ESTATE OF VOSE
Discussed

 
1979 OK 145, 604 P.2d 854, 
STEWART v. AMERADA HESS CORP.
Discussed

 
2018 OK 39, 419 P.3d 224, 
GENTGES v. OKLAHOMA STATE ELECTION BOARD
Cited

 
2018 OK 59, 427 P.3d 1052, 
HALL v. GALMOR
Discussed at Length

 
2019 OK 3, 457 P.3d 997, 
OKLA. SCHOOLS RISK MANAGEMENT TRUST v. MCALESTER PUBLIC SCHOOLS
Discussed

 
2020 OK 56, 473 P.3d 475, 
INDEPENDENT SCHOOL DISTRICT # 52 v. HOFMEISTER
Discussed

 
2020 OK 92, 480 P.3d 894, 
SHAWAREB v. SSM HEALTH CARE OF OKLAHOMA
Discussed

 
2021 OK 4, 485 P.3d 817, 
CLAUDE C. ARNOLD NON-OPERATED ROYALTY INTEREST PROPERTIES v. CABOT OIL & GAS CORP.
Discussed

 
2022 OK 4, 507 P.3d 688, 
PROGRESSIVE DIRECT INSURANCE CO. v. POPE
Discussed at Length

 
1925 OK 425, 238 P. 835, 111 Okla. 24, 
McKEE v. GRIMM
Discussed

 
2022 OK 79, 518 P.3d 531, 
WESTERN HEIGHTS INDEPENDENT SCHOOL DISTRICT v. STATE
Discussed

 
2023 OK 1, 523 P.3d 1106, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WRIGHT
Cited

 
2023 OK 12, 529 P.3d 905, 
OWENS v. OWENS
Discussed

 
2023 OK 13, 532 P.3d 1, 
TRES C v. RAKER RESOURCES
Discussed at Length

 
1981 OK 8, 623 P.2d 613, 
Wickham v. Gulf Oil Corp.
Discussed

 
1925 OK 1006, 247 P. 681, 118 Okla. 176, 
KILE v. AMERADA PETROLEUM CORP.
Discussed

 
1981 OK 78, 633 P.2d 743, 
McDonald v. Amtel, Inc.
Discussed

 
1981 OK 149, 638 P.2d 441, 
Mitchell v. Amerada Hess Corp.
Discussed

 
1982 OK 14, 645 P.2d 468, 
State ex rel. Com'rs of Land Office of Said State v. Amoco Production Co.
Discussed

 
1982 OK 49, 648 P.2d 14, 
Barby v. Singer
Discussed

 
1949 OK 167, 207 P.2d 1096, 201 Okla. 609, 
THORNBURGH v. COLE
Discussed at Length

 
1998 OK 24, 956 P.2d 887, 69 OBJ 1172, 
MILLER v. MILLER
Discussed

 
1998 OK 30, 958 P.2d 128, 69 OBJ 1404, 
GAYLORD ENTERTAINMENT CO. v. THOMPSON
Discussed

 
1998 OK 51, 968 P.2d 1201, 69 OBJ 2137, 
XAE CORP. v. SMR PROPERTY MANAGEMENT CO.
Discussed at Length

 
1999 OK 21, 977 P.2d 1086, 70 OBJ 1004, 
ENI Producing Properties Program Limited Partnership 1982-I v. Sampson Investment Co.
Cited

 
1999 OK 33, 987 P.2d 1185, 70 OBJ 1353, 
Patel v. OMH Medical Center, Inc.
Discussed

 
1999 OK 54, 983 P.2d 1016, 70 OBJ 1829, 
Kincaid v. Black Angus Motel, Inc.
Discussed

 
1944 OK 280, 152 P.2d 367, 194 Okla. 435, 
MAGNOLIA PETROLEUM CO. v. ST. LOUIS-S. F. R. CO.
Discussed

 
1944 OK 299, 152 P.2d 923, 194 Okla. 453, 
WALDEN v. POTTS
Discussed

 
1983 OK 91, 670 P.2d 588, 
Winn v. Nilsen
Discussed

 
1985 OK 38, 706 P.2d 523, 
Mercury Inv. Co. v. F.W. Woolworth Co.
Discussed

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 1141.1, 
Short Title
Discussed

 
12 O.S. 696.4, 
Provision for Costs, Attorney Fees, and Interest
Discussed at Length

 
12 O.S. 978, 
Recovery of Costs When Judgment or Final Order is Reversed
Cited

 
12 O.S. 2009, 
Pleading Special Matters
Cited

 
12 O.S. 2010, 
Form of Pleadings
Discussed

Title 15. Contracts

 
Cite
Name
Level

 
15 O.S. 59, 
Definition of Constructive Fraud
Cited

Title 52. Oil and Gas

 
Cite
Name
Level

 
52 O.S. 87.1, 
Common Source of Supply of Oil - Well Spacing and Drilling Units
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA